PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PULCHERIE TEKEU DJADJOU, a/k/a
Pulcherie Djadjou,

*Petitioner,*

v.

ERIC H. HOLDER, JR., Attorney
General,

*Respondent.*

No. 10-1889

On Petition for Review of an Order of
the Board of Immigration Appeals.

Argued: September 22, 2011

Decided: December 5, 2011

Before WILKINSON, WYNN, and FLOYD, Circuit Judges.

Petition denied by published opinion. Judge Floyd wrote the
majority opinion, in which Judge Wilkinson concurred. Judge
Wynn wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Lawrence David Rosenberg, JONES DAY,
Washington, D.C., for Petitioner. Keith Ian McManus,
UNITED STATES DEPARTMENT OF JUSTICE, Washing-
ton, D.C., for Respondent. **ON BRIEF:** Danielle Beach-

Oswald, BEACH-OSWALD IMMIGRATION LAW ASSO-
CIATES, PC, Washington, D.C., for Petitioner. Tony West,
Assistant Attorney General, Civil Division, Joseph A.
O'Connell, Office of Immigration Litigation, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C.,
for Respondent.

---

**OPINION**

FLOYD, Circuit Judge:

Pulcherie Tekeu Djadjou, a native and citizen of Cameroon,
applied for asylum and withholding of removal under the
Immigration and Nationality Act (INA) and protection under
the United Nations Convention Against Torture (CAT). The
Immigration Judge (IJ) denied all forms of relief, and the
Board of Immigration Appeals (BIA) affirmed. Djadjou now
petitions this court for review of the BIA's decision. Her peti-
tion asserts that the agency erred in making an adverse credi-
bility determination and, even if it did not so err, independent
evidence exists to establish past persecution. We uphold the
adverse credibility determination as supported by substantial
evidence and agree with the agency that Djadjou failed to pro-
vide sufficient independent evidence establishing past perse-
cution. Accordingly, we deny the petition.

I.

A.

Djadjou obtained a nonimmigrant visa and was admitted
into the United States on March 12, 2002. Her authorization
to stay in the United States expired two days later on March
14, 2002. She overstayed her authorization without permis-
sion. Not quite a year later, on February 18, 2003, she applied
for asylum and withholding of removal under the INA and

protection under the CAT. After the Department of Homeland Security served her with a Notice to Appear, Djadjou conceded removability at her initial hearing, but again requested asylum, withholding of removal, and protection under the CAT.

The IJ conducted a merits hearing that spanned the course of two days in August and September 2008. At the hearing, Djadjou testified and offered one witness to testify on her behalf. At the conclusion of the hearing, the IJ rendered an oral decision denying all forms of relief and ordered her voluntary departure. The BIA affirmed the IJ. Before explaining the bases for their decisions, we will recount the contents of Djadjou's testimony and her corroborating evidence.

## B.

Djadjou testified that she fled Cameroon because her life was in danger. This danger, she maintained, arose from the persecution that she suffered at the hands of Cameroonian officials. According to her testimony and application, Cameroonian officials arrested her four times and beat and raped her during her detainments. Her persecution, she insisted, resulted from her political activities with opposition organizations. What follows is Djadjou's version of events as reflected in her application and testimony.

Djadjou became involved in politics in Cameroon in 1991. At the time, she was a student at a university. While involved with a campus opposition group called the "Group of Less," she rose to the rank of action coordinator, which entailed organizing strikes and marches. In response to her political activities, the Cameroonian government blacklisted her from obtaining employment. This blacklisting ultimately caused her to open her own store in the Mokolo market in Yaounde, where she sold shoes, bags, jewelry, and clothes. She employed one salesperson at her store.

As a businesswoman, Djadjou traveled to different countries to buy goods. She traveled to the Gabon Republic five times between 1990 and 1998, and traveled to Syria on at least two occasions. Her passport admitted into evidence, which was issued in 1997, reflected that she went to the Gabon Republic in 1999. Each time she returned to Cameroon.

On May 27, 1991, like many of her fellow members in the Group of Less, she joined and became involved in the Social Democratic Front (SDF), an opposition party in Cameroon. She became secretary general of the young adults for the Mokolo, Komkana, Madagascar, and Carriere wards of the SDF in 1992. In that capacity, she was responsible for, among other things, notifying members about meetings and writing reports for the party. She remained a member of the SDF until 1996, when she changed political parties.

The SDF held its first meeting in Yaounde in May 1992. Sellers in the Mokolo market played a role in organizing the meeting. The SDF demanded that the government form a "National Sovereign Conference" to address the social, political, and cultural problems plaguing Cameroon. In response, the local police broke all of the counters of the Mokolo market sellers. When the SDF members resisted the local police by throwing rocks and building barricades, the police arrested them for public disturbance.

It was in this context that police officers first arrested Djadjou on May 18, 1992, during a protest march at the Mokolo market. She had helped mobilize the march and distribute flyers. After her arrest, the officers took her to the police station where they beat her on her legs and feet while insulting and threatening her. That night, an officer raped her in an interrogation room. Over the course of the next three days, she suffered further beatings. On May 21, 1992, her uncle obtained her release after speaking with the police commissioner.

Djadjou joined the Southern Cameroons National Council (SCNC), another opposition organization, on January 1, 1997. She rose in prominence within the organization and was elected secretary general that same year. Her activities as secretary general again involved providing information about meetings, printing flyers, and writing reports.

Her second arrest occurred on June 1, 1997, as a result of her position as secretary general of the SCNC. In April or May 1997, the government proclaimed, falsely, that the SCNC had attacked and vandalized government buildings. In response, officers arrested Djadjou at her store in Yaounde and detained her for a week. Because of her position in the SCNC, they thought she or her associates might have been responsible. Throughout the week, her detainers beat and insulted her. Her uncle again intervened to secure her release, showing the police commissioner invoices demonstrating that she was elsewhere at the time of the alleged attacks and vandalism.

Officials arrested Djadjou a third time on July 10, 2000, again because of her perceived role as a leader in the SCNC. That previous December, a radio station incorrectly announced that certain provinces had declared their independence as the Federal Republic of Southern Cameroon, prompting the government to investigate and round up the leaders of the SCNC, including Djadjou. Pursuant to a police summons, officials arrested Djadjou in Bassamba, where she had fled after hearing that officers were arresting SCNC members in Yaounde. The officers took her to Bangangte and detained her for three days. During that time, her detainers denied her food, beat her, and tortured her. The officers also shut down her store while she was in detainment. Her uncle, along with twenty other family members, convened on the police station and demanded her release. The commandant of the station relented and released her.

Djadjou's fourth and final arrest came on December 15, 2001. This arrest occurred at the market in Yaounde. She was

conferring with a fellow SCNC sympathizer about organizing a meeting when an official approached and began accusing her of sanitation violations at her store. The official ordered an officer to break down her counter and seize her merchandise. When she resisted, they arrested her. On the way to the police station, a car door was closed on her leg, cutting it badly. At the police station, two officers held her down and beat her. They placed her in a cell full of water and urine with six other detainees. Her detention lasted for four days, during which her detainers denied her health care, water, and food. After she lost consciousness and collapsed on the fifth day, they took her to the hospital. When the officer guarding her room at the hospital went to get a drink, she, with the help of her uncle, escaped through a back door.

Following Djadjou's escape from the hospital, her uncle drove her to Douala Bonaberi, where she hid at her older sister's house until it was safe for her to depart Cameroon. Because she was accustomed to traveling, she had her passport with her. To help her escape Cameroon, she obtained a visa from the United States Embassy under the guise of attending the 49th World Congress Association of Women Entrepreneurs, which was being held in Mexico from January 25, 2002, to January 31, 2002. Yet, when she went to the airport on January 25, she observed police officers looking for her. Frightened, she abandoned her plans and returned to hiding at her sister's house.

Her sister made arrangements for her to leave Cameroon in March 2002. This attempt was successful. She departed on March 11, 2002, and arrived in the United States the following day. Since her arrival in the United States, Cameroonian officials have continued looking for her. In October 2007, they destroyed her business in her absence.

## C.

Djadjou offered testimonial and documentary evidence to corroborate her testimony and application.

She admitted documentation from the SDF to support her testimony as to the persecution she suffered from her activities in that organization. She offered an SDF membership card. Also, she provided two letters from the SDF. One letter indicated Djadjou was a member of the SDF from 1991 to 1996, stated that she was the ex-secretary of propaganda in charge of youth affairs, and noted that government officials were looking for her. The other letter stated that she has been an active member of the SDF since 1991 and was the victim of "great tortures."

Likewise, she submitted SCNC membership cards and an affidavit from the Chairman of the Southern Cameroons National Council in the United States of America (SCNC-USA), Derrick Njoh, to corroborate her testimony about her role in the SCNC in Cameroon and the persecution that she suffered as a result. Njoh attested that SCNC records in Cameroon confirmed Djadjou's membership since 1997, her instrumental role in handing out flyers, tracts, and similar items, and her participation in demonstrations. As a result, he stated, she was arrested and detained in 2000, and her husband was arrested and tortured in 1997. He obtained this information, he maintained, through telephone conversations with an SCNC official in Cameroon.

One witness, Howard Njeck, the Vice Chairman of the SCNC-USA, testified on her behalf. He stated that he has known Djadjou since 2004 when he met her at SCNC-USA meetings in the United States. He recounted that, at those meetings, Djadjou discussed her prior arrests in Cameroon. Njeck also described the efforts taken by Njoh in verifying the information in his affidavit. He affirmed that Njoh called the SCNC official in Cameroon and that the official, although not having personal knowledge of Djadjou, checked the records of the SCNC. Njeck reiterated that the Cameroonian official told Njoh that Djadjou was arrested in 2000 and her husband was arrested in 1997. Aside from explaining how Njoh obtained the information, Njeck further asserted that he

undertook his own independent verification of the information by calling his friend who is active in the SCNC in Yaounde. According to Njeck, his friend checked the SCNC's records in Cameroon and confirmed that Djadjou was active in the organization. Although Njeck knew that the SCNC kept a leadership listing, he was unaware of her holding the position of secretary general. Finally, Njeck affirmed that Djadjou was an active member of the SCNC-USA and regularly attended its meetings in the United States.

Djadjou also presented letters and affidavits from family and friends to corroborate her claims. Her uncle submitted an affidavit supporting her testimony regarding the four arrests, her escape from the hospital, and the government officials destroying her shop after she departed Cameroon. Her sister provided an affidavit stating that Djadjou hid at her house after her fourth arrest and that she arranged for Djadjou's departure from Cameroon. Finally, Djadjou submitted an affidavit from a friend who attested to her second and fourth arrests.

Djadjou further provided police documents from Cameroon. One was a "convocation" issued on July 9, 2000, that summoned her to appear at the police station in Bangangte on July 10, 2000. The other was a telegram dated January 2, 2002, stating that Djadjou was fleeing to Bonaberi and requesting that she be stopped for an illegal political meeting.

Djadjou submitted an eviction notice for her business dated March 11, 2002. In the eviction notice, a Cameroonian clerk of court ordered that Djadjou vacate the premises within seventy-two hours. Notably, the eviction notice included the following handwritten notation: "Mrs. DJADJOU Pulcherie residing in Yaounde, and her residence or place of work where she was and talking to: (her being present on the premises receives the copy and refuses to sign)." The clerk of court served the eviction notice at Djadjou's business.

Finally, Djadjou offered four other pieces of evidence. She provided photographs of destroyed property. Presumably these photographs depicted Djadjou's destroyed store. She also admitted reports from Amnesty International and the United States Department of State, and an affidavit from Justice Aloysius, a leader in the Southern Cameroons National Council North America (SCNC/NA). The reports and Justice Aloysius discussed the persecution of SCNC leaders and members in Cameroon. Justice Aloysius also added that Djadjou was a member of the SCNC/NA.

### D.

The IJ determined that Djadjou failed to prove past persecution or a well-founded fear of future persecution. In doing so, she made an adverse credibility finding as to Djadjou, but she found Njeck's testimony credible insofar as he testified consistently with Njoh's SCNC-USA affidavit. She proceeded to provide specific reasons for rejecting each piece of Djadjou's corroborating evidence. She noted various inconsistencies between, or omissions in, Djadjou's testimony and corroborating evidence, and explained why she found each piece of evidence deficient:

- Djadjou testified to being secretary general of the SCNC, yet none of her corroborating evidence mentioned her holding that position, including Njoh's affidavit from the SCNC-USA, and Njeck testified that he had no knowledge of her holding the position. Also, Djadjou's own application statement did not mention her leadership position.

- Djadjou testified she was arrested four times, but Njeck and Njoh attested to her being arrested in 2000 and did not verify the other arrests. Although the SCNC might have been unaware of her 1992 arrest because she was associated with

the SDF at the time, they nevertheless did not mention her other two arrests. The IJ determined that Djadjou offered no satisfactory reason for the omission.

- Njeck's and Njoh's statements were based on what Cameroonian SCNC officials told them that records in Cameroon reflected, but Djadjou did not submit those records. The IJ determined this to be a "significant omission" and noted no other records corroborated their statements.

- One of Djadjou's SCNC membership cards misspelled the name of the organization by leaving the "s" off "Cameroons." The IJ found her explanation of a printing error unconvincing.

- One SDF letter stated she "is an active member," but Djadjou testified that she ended her membership in 1996. The IJ did not accept Djadjou's explanation that the SDF letter embodied a grammatical error.

- One SDF letter stated she was a member and did not mention her leadership position with the SDF, but another SDF letter asserted that she was an ex-secretary of propaganda in charge of youth affairs. Also, one SDF letter referred to her generally being the victim of torture, but the other did not. Neither letter mentioned the 1992 arrest to which she testified. The IJ further noted there was no source for the information in either letter.

- Djadjou testified that she was in hiding at her sister's house from December 2001 until she departed for the United States, but her eviction notice indicated that she was personally served with the notice by a government official in a pub-

lic location on March 11, 2002. (The BIA observed she was at her store when served.) The IJ refused to credit the explanation that the eviction notice referred to her salesperson, not Djadjou.

- Djadjou left Cameroon after her 1992 and 1997 arrests, but voluntarily returned, as evidenced by her passport and testimony. The IJ refused to credit her explanation that she wanted to continue the fight and found that her voluntary return undermined her credibility about her arrests and persecution.

- The government permitted Djadjou's business to continue to operate, even years after she departed Cameroon, despite her being an opposition activist.

- The police convocation and police telegram were not authenticated, and Djadjou did not establish a chain of custody for them.

- The letters from family and friends were not objective evidence.

- No objective corroborating evidence established that the photographs actually depicted Djadjou's destroyed business.

As a result, the IJ did not credit that Djadjou was an SDF member or arrested in 1992 as she claimed. She found that Djadjou may have belonged to the SCNC, but she did not credit that she was arrested in 1997, 2000, and 2001 because of her activities with the SCNC. She found that no persuasive objective evidence established that Djadjou was arrested because of her political activities and determined that she did not flee Cameroon in fear for her life. Thus, the IJ held that

Djadjou did not establish past persecution or a well-founded fear of future persecution, and concluded that Djadjou did not satisfy the requirements for asylum and withholding of removal under the INA or protection under the CAT.

Following Djadjou's appeal of the IJ's order, the BIA issued its decision on July 9, 2010. In discussing the IJ's adverse credibility determination, the BIA stated, "As noted by the Immigration Judge, the respondent provided conflicting statements and material omissions regarding the alleged mistreatment in Cameroon," and cited to the IJ's analysis. It then stated, "For example," and reiterated some of the reasons provided by the IJ for making an adverse credibility determination. The BIA also agreed with the IJ that Djadjou failed to offer reasonably available objective evidence to support her claim. It noted a few additional inconsistencies and deficiencies in Djadjou's evidence:

- One SDF letter that Djadjou submitted stated she was a member from 1991 until 1996, but the other letter indicated she was still an active member.

- Njeck had no firsthand knowledge of Djadjou's mistreatment.

- Djadjou failed to offer reliable evidence from the SDF or SCNC to corroborate her claims.

The BIA affirmed the IJ's decision that Djadjou failed to prove past persecution or a well-founded fear of future persecution to qualify for asylum. It also agreed that she did not establish eligibility for withholding of removal or protection under the CAT. Thus, the BIA dismissed Djadjou's appeal.

## II.

## A.

We begin with an overview of the relief that Djadjou seeks. As noted, she asserts she is eligible for three forms of relief: asylum and withholding of removal, both under the INA, and protection under the CAT.

The INA vests in the Attorney General the discretionary power "to grant asylum to aliens who qualify as 'refugees.'" *Dankam v. Gonzales*, 495 F.3d 113, 115 (4th Cir. 2007). A refugee is "someone 'who is unable or unwilling to return to' his native country 'because of persecution or a well-founded fear of persecution on account of . . . political opinion' or other protected grounds." *Id.* (quoting 8 U.S.C. § 1101(a)(42)(A)). Asylum applicants carry the burden of proving that they satisfy the definition of a refugee to qualify for discretionary relief. *Id.* They may satisfy this burden by "showing either that [they were] subjected to past persecution or that [they have] a 'well-founded' fear of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010) (quoting 8 C.F.R. § 208.13(b)(1)). A rebuttable presumption of a well-founded fear of persecution arises when an applicant establishes past persecution. *Id.*

Aliens face a heightened burden of proof "to qualify for withholding of removal to a particular country under the INA." *Dankam*, 495 F.3d at 115. They must show a "'clear probability of persecution' on account of a protected ground." *Id.* (quoting *INS v. Stevic*, 467 U.S. 407, 430 (1984)). If they meet this heightened burden, withholding of removal is mandatory. *Id.* But because the standard for withholding of removal is higher than the standard for asylum, if applicants cannot demonstrate asylum eligibility, their applications for

withholding of removal will necessarily fail as well. *Marynenka*, 592 F.3d at 600.

Aliens may also seek protection from removal under the CAT. *Dankam*, 495 F.3d at 115. The CAT requires aliens to demonstrate "that it is more likely than not that [they] would be tortured if removed to the proposed country of removal." *Id.* (quoting 8 C.F.R. § 208.16(c)(2)) (internal quotation marks omitted). It is a mandatory form of relief as well. *Id.* at 115-16. Unlike applicants for asylum and withholding of removal under the INA, applicants for protection under the CAT do not need to show that the likelihood of torture is connected to a protected ground. *Id.* at 115.

B.

"When, as here, the BIA adopts the IJ's decision and includes its own reasons for affirming, we review both decisions." *Marynenka*, 592 F.3d at 600. We are obliged to uphold the BIA's determinations unless they are "manifestly contrary to the law and an abuse of discretion." *Lizama v. Holder*, 629 F.3d 440, 444 (4th Cir. 2011) (quoting *Mirisawo v. Holder*, 599 F.3d 391, 396 (4th Cir. 2010)) (internal quotation marks omitted). The agency abuses its discretion "if it fail[s] to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." *Tassi v. Holder*, No. 10-2194, slip op. at 13 (4th Cir. Nov. 7, 2011).

Our standard of review of the agency's findings is narrow and deferential. *Dankam*, 495 F.3d at 119. We seek to ensure that the agency's factual findings are supported by substantial evidence. *Marynenka*, 592 F.3d at 600. Substantial evidence exists to support a finding "unless the evidence . . . was such that any reasonable adjudicator would have been compelled to conclude to the contrary." *Id.* (quoting *Haoua v. Gonzales*, 472 F.3d 227, 231 (4th Cir. 2007)) (internal quotation marks omitted). Similarly, we cannot reverse the agency's overall decision that an applicant is ineligible for asylum unless we

determine that the applicant's evidence "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Our review of legal issues, however, is de novo. *Marynenka*, 592 F.3d at 600.

### III.

We first address Djadjou's contention that substantial evidence does not support the agency's adverse credibility determination. For the following reasons, we find that substantial evidence exists to support the agency's adverse credibility determination.

### A.

Applicants can satisfy their burden of proving eligibility for asylum simply by testifying credibly. 8 C.F.R. § 208.13(a). Corroborating evidence, though not always required, may be necessary "when it is reasonable to expect such proof and there is no reasonable explanation for its absence." *Lin-Jian v. Gonzales*, 489 F.3d 182, 191-92 (4th Cir. 2007).

Our review of an adverse credibility determination is limited to ensuring that substantial evidence exists to support it. *Dankam*, 495 F.3d at 119. We accord broad deference to the agency's credibility determination. *Id.* This deference, however, is not absolute, for the agency must provide specific, cogent reasons for making an adverse credibility determination. *Anim v. Mukasey*, 535 F.3d 243, 252 (4th Cir. 2008).

We have recognized that omissions, inconsistent statements, contradictory evidence, and inherently improbable testimony are appropriate bases for making an adverse credibility determination. *Kourouma v. Holder*, 588 F.3d 234, 243 (4th Cir. 2009); *Lin-Jian*, 489 F.3d at 189. The existence of only a few such inconsistencies, omissions, or contradictions can be sufficient for the agency to make an adverse

credibility determination as to the applicant's entire testimony regarding past persecution. *See Camara v. Ashcroft*, 378 F.3d 361, 369 (4th Cir. 2004) (upholding an IJ's adverse credibility determination based on two inconsistencies). Minor omissions, inconsistencies, and contradictions that do not go to the heart of the applicant's claims, however, do not necessarily support an adverse credibility determination.[1] *Tassi*, No. 10-2194, slip op. at 7 n.6. Speculation, conjecture, and unsupported personal opinion are insufficient reasons to discount an applicant's testimony or corroborating evidence. *Lin-Jian*, 489 F.3d at 189.

B.

We highlight two findings made by the agency that provide substantial evidence for its adverse credibility determination: 1) the eviction notice served on Djadjou at her store when she testified that she was in hiding elsewhere and 2) her failure to mention her purported leadership role in her application statement.

The IJ and BIA found that the eviction notice was inconsistent with Djadjou's testimony. They observed that, although Djadjou testified she remained in hiding at her sister's house in Douala Bonaberi until she departed for the United States on March 11, 2002, the eviction notice indicated that she was present at her store in Yaounde and served with the notice the same day. The IJ considered Djadjou's explanation that the eviction notice was referring to her salesperson,[2] but rejected

---

[1]The REAL ID Act of 2005 changed this rule and provides that an inconsistency can serve as a basis for an adverse credibility determination "without regard to whether [it] goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). But because Djadjou filed her application before the effective date of the Act, it is inapplicable. *See Tassi*, No. 10-2194, slip op. at 7 n.6.

[2]Djadjou also challenges the agency's reliance on the eviction notice on the ground that the notice is insufficiently clear to allow her to rebut its

it, determining that the plain language of the eviction notice indicated that it was referring to Djadjou. This was a reasonable interpretation of the eviction notice that is entitled to our deference. *See Dankam*, 495 F.3d at 122.

The BIA and IJ were justified in finding that the eviction notice was inconsistent with Djadjou's testimony. That Djadjou was at her store and capable of government officials serving her with an eviction notice suggests she was not in hiding at her sister's house as she testified. As the IJ found, this is a significant inconsistency. Djadjou's testimony that she was in hiding not only bolstered her allegation of her last arrest, but also indicated that she was persecuted to the point of her going into hiding. This is not a collateral matter, but goes to the heart of her claims of past persecution. Accordingly, the inconsistency between the eviction notice and Djadjou's testimony was an appropriate basis for an adverse credibility determination.

The IJ also noted an inconsistency between Djadjou's testimony that she was elected secretary general of the SCNC and her statement in support of her application, which omitted any reference to her holding that position. As the IJ recognized, Djadjou testified that she was elected secretary general of the SCNC in 1997. Yet the statement in support of her application omits any reference to her election to that post, noting only

---

contents. She asserts that the relevant part is a handwritten notation that may have been mistranslated from French to English. To support this contention, she relies on the following statement from our decision in *Anim v. Mukasey*: "[D]ocumentary evidence—especially evidence that is particularly damning to an applicant's case—should be sufficiently clear and complete to give the applicant an opportunity to meaningfully rebut its allegations." 535 F.3d at 257. Djadjou's reliance on *Anim* is misplaced. We note simply that our concerns in *Anim* to which she cites arose from the introduction of a document by the government. Here, however, Djadjou, not the government, admitted the eviction notice in support of her application. We, therefore, are not concerned with whether it was clear enough for her to challenge its contents like we were in *Anim*.

her selection to a leadership role in the SDF in 1992. Further-more, Njeck, her witness, admitted he had no knowledge that she held such a post even though the SCNC maintains leader-ship listings, and Njoh's affidavit on behalf of the SCNC-USA did not mention it.

Djadjou asserts that the omission or inconsistency regard-ing her position as secretary general was immaterial. We dis-agree. Djadjou testified that she was arrested the second time because of her position as secretary general in the SCNC. She also attested that her third arrest resulted from her perceived leadership role. Thus, her purported leadership role lay at the heart of her claims of past persecution. She asserted that Cam-eroonian officials targeted her because of it. Her failure to mention it in her application reasonably casts doubt not only on whether she held the position, but also on whether officials targeted her as she claimed. The agency appropriately relied on this omission as a basis for its adverse credibility determi-nation.

Based on the inconsistency arising from Djadjou's eviction notice suggesting she was not in hiding as she claimed and the omission in her application of her leadership role in the SCNC, we conclude that a reasonable adjudicator could find Djadjou to lack credibility. The inconsistency and omission reasonably cast doubt on aspects of Djadjou's testimony that went to the heart of her claims of past persecution, and their cumulative effect could cause a reasonable adjudicator to question the veracity of her overall testimony. Thus, we hold that substantial evidence exists to support the agency's adverse credibility determination.

IV.

A.

Despite an adverse credibility determination, applicants for asylum can establish past persecution through independent

evidence. *See Camara*, 378 F.3d at 369-70. Where independent evidence apart from the applicant's testimony and application statement exists, the agency must consider whether it is sufficient to establish a claim of past persecution. *See id.* at 370. The agency may not ignore such evidence and reject the claim solely on the basis of the adverse credibility determination. *See id.*

Djadjou insists that independent evidence apart from her testimony and application statement exists to establish past persecution. According to Djadjou, the agency discredited much of her corroborative evidence for legally erroneous reasons. That evidence, she contends, independently establishes her past persecution despite the adverse credibility determination. We disagree.

### B.

In reviewing the agency's decisions, our task is not to decide whether we agree with the agency's reasons or would discredit the evidence if we stood in its shoes. Rather, we ensure that substantial evidence supports its findings, which means we simply determine whether any reasonable adjudicator would be compelled to conclude to the contrary. *Anim*, 535 F.3d at 252. Unless any reasonable adjudicator would be compelled to conclude differently, we defer to the agency. *See id.* The agency, however, must provide specific, cogent reasons for discrediting documentary evidence. *Kourouma*, 588 F.3d at 241.

The agency refused to credit the affidavits and letters provided by Djadjou's uncle, sister, and friend on the ground that such evidence is not objective. We have recognized before that "evidence offered as corroborating evidence [must] be objective . . . for it to be considered by the immigration judge and BIA." *Id.* Letters and affidavits from family and friends are not objective evidence in this context. *See Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 358-59 (4th Cir. 2006).

Consequently, the agency did not err in refusing to credit the affidavits and letters provided by Djadjou's family and friends.

The agency also refused to credit Njeck's testimony and Njoh's affidavit with respect to Djadjou's 2000 arrest and her husband's 1997 arrest. By noting the absence of reliable corroborating evidence from the SCNC, the BIA essentially found that Njeck's and Njoh's statements were unreliable. Throughout their decisions, the BIA and IJ noted various deficiencies with the statements, including the lack of personal knowledge, the statements' omission of key facts from Djadjou's testimony, and Djadjou's failure to submit the records on which Njeck and Njoh based their assertions. The IJ also expressed skepticism about whether the Cameroonian official who provided the information to Njoh actually examined the records. From both the IJ's and BIA's decisions, we glean an overall concern about the reliability of Njoh's and Njeck's statements when they attested to events of which they had no personal knowledge based on records that they had not reviewed and were not submitted. In essence, the hearsay nature of the statements, which involved multiple levels of hearsay, contributed to the agency's concerns about their reliability.

We begin with the general observation that the Federal Rules of Evidence do not apply in immigration hearings, which means that hearsay evidence is admissible. *Anim*, 535 F.3d at 256-57. For that reason, the agency may not reject corroborative evidence on the sole basis that it does not comport with the Federal Rules of Evidence. *Tassi*, No. 10-2194, slip op. at 16.

Nevertheless, we have previously recognized that letters relying on multiple levels of hearsay raise special reliability concerns. In *Anim*, the government introduced a letter from an official at the United States Department of State asserting that she had contacted the petitioner's native country in evaluating

documents the petitioner had introduced. 535 F.3d at 250. She noted that she did so without disclosing that her request pertained to an asylum application. *Id.* Officials from the petitioner's native country told the State Department that the documents were forgeries. *Id.* The letter contained multiple levels of hearsay, as the State Department official had contacted an investigator at the local embassy, who then contacted officials in the petitioner's native country. *Id.* The immigration judge allowed the government to introduce the letter. *Id.* at 251.

We held that the letter was so unreliable that its use was fundamentally unfair to the petitioner. *Id.* at 256. One of our chief concerns was that it relied on multiple levels of hearsay. *Id.* at 257. Despite noting that hearsay is admissible in immigration hearings and that the Federal Rules of Evidence do not apply in such hearings, we also recognized that "[h]ighly unreliable hearsay might raise due process problems." *Id.* (alteration in original) (quoting *Alexandrov v. Gonzales*, 442 F.3d 395, 405 (6th Cir. 2006)) (internal quotation marks omitted). We reasoned that "[m]ultiple hearsay, where the declarant is steps removed from the original speaker, is particularly problematic because the declarant in all likelihood has been unable to evaluate the trustworthiness of the original speaker." *Id.* We also noted that the letter was made all the more unreliable because the original source was the native country's government officials, who had a powerful incentive not to be candid. *Id.* We further determined that the lack of sufficient information as to how the officials conducted the investigation into the authenticity of the documents was problematic because it prevented the agency from evaluating the reliability of the letter's conclusions and denied the petitioner a meaningful ability to rebut its conclusions. *Id.* at 257-58. Because the use of the letter was fundamentally unfair and prejudiced the petitioner, we found a due process violation. *Id.* at 261.

Although *Anim*'s discussion of multiple hearsay arose in a different context, many of the same concerns about letters

relying on multiple levels of hearsay are implicated here. We think these concerns apply with equal force when determining whether to credit such a statement submitted by an applicant. Statements relying on multiple levels of hearsay are typically, though not always, highly unreliable whether offered by the government or the applicant. If such evidence can be so highly unreliable as to render a proceeding fundamentally unfair when the government introduces it, the agency may likewise refuse to credit it due to its unreliability when introduced by the applicant. Although we can conceive that statements relying on multiple levels of hearsay may, at times, contain sufficient indicia of reliability so as to counteract their inherent unreliability, this is not one of those times.

In this case, Njoh's and Njeck's statements relied on multiple levels of hearsay. Njoh and Njeck contacted officials in Cameroon who conveyed information they observed in records that were supposedly accurate. Neither Njeck nor Njoh reviewed the records personally to ascertain their accuracy or trustworthiness. Therefore, they could not vouch for their accuracy or reliability. Although the IJ found Njeck credible insofar as his statement was consistent with Njoh's affidavit, that finding of credibility says nothing about the reliability of the underlying information.

Moreover, Njeck and Njoh did not include any information to alleviate the reliability concerns associated with multiple levels of hearsay. They offered no information about the Cameroonian officials who reviewed the records aside from stating their names and titles. The IJ was utterly unable to determine whether the Cameroonian officials were credible. Njeck and Njoh did not detail the recordkeeping practices of the SCNC in Cameroon, but instead generally noted that the SCNC keeps records of members that include arrests. Because neither Njeck nor Njoh could vouch for the reliability of the information and they did not include anything to bolster its reliability, the IJ was essentially left without any means of assessing it. A reasonable fact finder would naturally be con-

cerned about the weight to ascribe such evidence. Thus, the agency had reasonable grounds for concern about the reliability of Njeck's and Njoh's statements that Djadjou was arrested in 2000 and that her husband was arrested in 1997.

We therefore hold that the agency had an appropriate basis for rejecting as unreliable Njeck's and Njoh's statements about Djadjou's arrest.[3] In doing so, we continue to recognize that the Federal Rules of Evidence do not apply in immigration hearings and that hearsay is admissible. At the same time, however, statements that rely on multiple levels of hearsay can be so highly unreliable by their nature as to justify the agency in refusing to credit them. Because the statements offered by Njoh and Njeck, which relied on multiple levels of hearsay, were highly unreliable by their nature and nothing in the statements alleviated the concerns about their reliability, the agency had adequate justification to find them unreliable and refuse to credit them.

---

[3]Djadjou argues that the agency erred in its decision to discredit Njoh's affidavit and Njeck's testimony because it essentially required independent corroborating evidence to support corroborating evidence. Indeed, we previously announced that "[t]here is no general rule that evidence offered in corroboration requires independent corroboration." *Marynenka*, 592 F.3d at 602. In *Marynenka*, we found the immigration judge erred in declining to credit the statement of a witness who had personally observed the petitioner's arrest simply because there was no way to corroborate that information. *Id.* We held that the statement "could not be discredited on the ground that it *automatically* required corroboration." *Id.* In this case, however, the agency refused to credit Njeck's and Njoh's statements because of their unreliability. Although the IJ noted the absence of other corroborating evidence concerning the 2000 arrest, that was an additional observation among others and not the sole reason for disregarding their statements. Unlike in *Marynenka*, the agency did not automatically reject Njeck's and Njoh's statements simply because they were not independently corroborated. We find that the agency rejected Njoh's and Njeck's statements as unreliable and that it did not err by additionally observing the lack of other corroborating evidence of her 2000 arrest and her husband's 1997 arrest.

The agency also gave appropriate reasons for discrediting the two SDF letters. As the agency noted, the two letters were inconsistent. One letter noted that Djadjou had been a member from 1991 until 1996, but the other letter stated that she "is an active member."[4] A reasonable adjudicator could interpret this as a direct inconsistency. Furthermore, one letter mentions that she was tortured, whereas the other letter does not. And one letter mentions that she held a leadership role in the SDF, but the other letter merely states that she was a member with no mention of a leadership position. Based on the cumulative effect of these various inconsistencies and omissions, we are unable to say that any reasonable adjudicator would have been compelled to find them credible. *See Dankam*, 495 F.3d at 122-23 (recognizing that the cumulative effect of seemingly minor and tangential inconsistencies can form the basis of an adverse credibility determination). Thus, the agency's refusal to credit them is supported by substantial evidence.

The agency discounted the police convocation and police telegram on the ground that Djadjou failed to authenticate and provide a chain of custody for them. Djadjou maintains that these were legally improper reasons to reject the police documents. We agree.

As earlier noted, the Federal Rules of Evidence do not apply in immigration hearings. *Anim*, 535 F.3d at 256. We have previously determined that it was improper to reject a

---

[4]Djadjou asserts that the letter stating she "is an active member" contains a grammatical mistake and that it was meant to say she "was an active member." Contrary to her assertion, however, it is unclear that this was simply a grammatical error. The sentence, in full, states as follows: "Djadjou Tekeu Pulcherie is an active member of the Social Democratic Front (S.D.F.) opposition party based in Cameroon; registered in our book of militants under the reference card [reference card number] since 1991." Aside from Djadjou's proffered interpretation, we see no suggestion of a grammatical error. The agency's interpretation of the letter as indicating that she presently is a member is reasonable, and so we will defer to it.

document for lacking a chain of custody when no other reasons existed for doubting its authenticity. *Marynenka*, 592 F.3d at 601. Also, we recently found it inappropriate to refuse to credit a document because it was not authenticated when doubts about its authenticity did not arise at the hearing and the government did not object to its introduction. *Tassi*, No. 10-2194, slip op. at 19-20. Here, concerns about the authenticity of the police telegram and convocation did not arise at the hearing, and the government did not object to their introduction. Furthermore, the agency provided no other reasons for finding the documents unauthentic or unreliable. As a result, the agency erred in rejecting the police convocation and telegram.

Nevertheless, we hold that the agency's error in rejecting the police telegram and police convocation was harmless. "Harmless-error analysis applies in immigration cases." *Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004). We need not reverse the agency's decision if we determine that an "error 'clearly had no bearing on the procedure used or the substance of the decision reached.'" *Id.* (quoting *Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964)). Even had the agency credited the police telegram and convocation, it is clear that insufficient independent evidence existed to establish past persecution.

The remaining independent evidence, which the agency did not discredit or appropriately discredit, includes Djadjou's SCNC and SDF membership cards,[5] the police telegram and convocation, the photographs of destroyed property, the Amnesty International and United States Department of State reports, and Justice Aloysius's affidavit. This evidence, stand-

---

[5]The IJ discredited one of Djadjou's SCNC membership cards because it misspelled the organization's name. Djadjou challenges that finding. We need not decide whether the IJ erred because any such error would be harmless. The IJ credited that Djadjou was a member of the SCNC, just not that she was persecuted because of her membership.

ing alone and without any credible explanation, fails to establish that Djadjou was persecuted. All that the membership cards, reports, and Justice Aloysius's affidavit demonstrate is that Djadjou was a member of opposition organizations whose members have suffered persecution in Cameroon. The police documents, without any context or credible explanation, do not demonstrate that she was among those persecuted. Although the police telegram requests that Djadjou be stopped and states "illegal political meetings," it says nothing about what actually transpired. The police convocation similarly lacks any meaningful significance without a credible explanation as to its context. Likewise, the photographs are devoid of meaning without a credible explanation as to what they depict. Accordingly, we affirm the agency's finding that independent evidence does not exist to establish past persecution.

V.

For the foregoing reasons, we deny Djadjou's petition for review.

*PETITION DENIED*

WYNN, Circuit Judge, dissenting:

There is much in the majority's opinion with which I am inclined to agree. But given that the salient factual findings and reasoned legal conclusions in this well-crafted majority opinion are products of an appellate court rather than the products of the immigration judge or the Board of Immigration Appeals, I respectfully dissent.*

---

*I reemphasize, as we did in *Zuh v. Mukasey*, 547 F.3d 504, 513-514 (4th Cir. 2008), that consistency in the resolution of immigration cases is a problem area for this and other circuits. *See also Benslimane v. Gonzales*, 430 F. 3d 828, 829 (7th Cir. 2005); Eric M. Fink, *Liars and Terrorists and Judges, Oh My: Moral Panic and the Symbolic Politics of Appellate Review in Asylum Cases*, 83 Notre Dame L. Rev. 2019 (2008); Jaya Ramji-Nogales et al., *Refugee Roulette: Disparities in Asylum Adjudication*, 60 Stan. L. Rev. 295 (2007).

The law applicable to Djadjou's claim for asylum and withholding of removal under the Immigration and Nationality Act is clear. To establish eligibility for asylum, Djadjou bears the burden of showing either past persecution or a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). If Djadjou is able to demonstrate past persecution, she is "presumed to have a well-founded fear of persecution . . . ." 8 C.F.R. § 208.13(b)(1)); *see Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010).

In the present case, given the absence of any evidence by the government in rebuttal, if Djadjou demonstrated an instance of past persecution on a protected ground, then Djadjou established an unrebutted presumption of her "well-founded fear of persecution" and, consequently, her eligibility of asylum in this country. Notably, Djadjou's imprisonment on account of her membership in a particular social group or political opinion "indisputably can constitute [past] persecution." *Camara v. Ashcroft*, 378 F.3d 361, 370 (4th Cir. 2004) (citing *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004)).

In determining whether an individual is eligible for asylum, the agency must first undertake a credibility determination as to the applicant's evidence. Here, I am inclined to concur in the majority's holding that substantial evidence in the record supported the agency's adverse credibility determination.

However, in my view it is the eviction notice alone that provided the agency with this substantial evidence. All other evidence relied on by the agency was either erroneous as a matter of law or implicated an abuse of discretion. Given that the majority's decision to affirm the adverse credibility determination is limited to two pieces of evidence relied upon by the agency (i.e., the eviction notice and Djadjou's asylum

application), I will, in turn, limit my expression of dissent to this second piece of evidence—Djadjou's asylum application.

According to the majority, the inconsistency between Djadjou's testimony that she was elected secretary general of the Southern Cameroons National Council ("SCNC") in 1997 and her statement in support of her asylum application, which omitted any reference to her position, provided the immigration judge with a basis for its adverse credibility determination. *Ante* at 17-18. For the majority, this omission is properly characterized as substantial evidence because, in the majority's view, Djadjou's leadership role in SCNC is at the heart of her claim of past persecution. *Ante* at 18. In my view, however, not only is this alleged omission illusory, this alleged omission most assuredly does not go to the heart of Djadjou's claim.

First, notwithstanding the immigration judge's unsupported conjecture that Djadjou had "what appears to be a significant position" J.A. 102, Djadjou's responsibilities in SCNC were, by all accounts, limited to passing out flyers and informing SCNC members of meetings in her local area. Accordingly, when Njeck called SCNC officials in Cameroon to verify Djadjou's participation and past persecution, he did not even ask about her specific title. Further, when asked why an SDF letter and the SCNC affidavit did not mention her specific title, Djadjou testified that "they pay more attention to positions like the president's position, the vice president's position . . . and the spokesperson position." J.A. 281. There is no inconsistency in the failure of a document, whether Djadjou's application or otherwise, to mention a title where the authors of such documents, whether Djadjou or others, considered such title to be unimportant to Djadjou's persecution claim or her role in the organization. Consequently, this omission, insofar as it is relied upon by the agency to make an adverse credibility determination, is illusory and, indeed, based on the unsupported conjecture that Djadjou's position in the SCNC

was "a significant position" that necessarily required mention in any discussion of Djadjou's activities as an SCNC member.

Second, Djadjou's asylum application states that she was persecuted "[b]ecause [she] was a member of the SCNC"; it does not claim that Djadjou was persecuted because of her position in the SCNC. J.A. 560. Consequently, ambiguous assertions that Djadjou made while testifying, that may or may not be interpreted as indicating that she was targeted during her second arrest because of her position in the SCNC, do not replace the clear and unambiguous assertions that Djadjou made in her asylum application and become, by judicial fiat or otherwise, the "heart" of her persecution claim. Therefore, not only are the alleged omissions in Djadjou's application illusory and based on unsupported conjecture, the alleged omissions—even assuming some materiality—simply fail to go to the heart of her persecution claim and, thus, do not provide substantial evidence for an adverse credibility determination. *See Ante* at 16 (citing *Tassi v. Holder*, No. 10-2194, slip op. at 7 n.6 (4th Cir. Nov. 7, 2011)).

Nonetheless, as noted above, based solely on the immigration judge's finding of an inconsistency between the eviction notice and Djadjou's testimony, I am inclined to concur in the majority's holding that substantial evidence in the record supported the agency's adverse credibility determination.

However, as the majority aptly explains, notwithstanding an adverse credibility determination, applicants for asylum, such as Djadjou, may establish past persecution through independent evidence. *See Camara*, 378 F.3d at 369-370. As the majority states, "[t]he agency may not ignore such [independent] evidence and reject the claim solely on the basis of the adverse credibility determination." *Ante* at 19 (citing *Camara*, 378 F.3d at 369-70). Moreover, in reviewing Djadjou's independent evidence, the "immigration judge cannot reject documentary evidence without specific, cogent reasons why the

documents are not credible." *Kourouma v. Holder*, 588 F.3d 234, 241 (4th Cir. 2009).

Here, among other independent evidence submitted, Djadjou presented the affidavit of Njoh, which provided, in pertinent part, that:

> 1)  . . . I am the chairman of the Southern Cameroons National Council in North America . . . .
>
> 2)  . . . SCNC is viewed by the government of [Cameroon] as a secessionist movement and in lieu of this perception, the government persistently embarks on a campaign of arrests, intimidation, harassments, detentions and extrajudicial killing of SCNC members.
>
> * * *
>
> 5)  That our records from the home front through the SCNC Information and Statistic Bureau in Southern Cameroons which is [the] repository of vital biographical information of SCNC members attest to [Djadjou's] membership and active participation in popularizing the struggle to liberate and restore the statehood of Southern Cameroons. Corroborative and authentic information from the home front reveals that [Djadjou's] activism in the struggle dates as far back as 1997 and she was instrumental in distributing SCNC flyers, tracts, hand outs and other paraphernalia to the population. Reports from the home front also indicate that she attended meetings and participated in demonstrations. These activities made her the target of acrimonious arrest and detention such as the arrest of 2000. Unimpeachable evidence from the home front reveal that the husband of [Djadjou] . . . suffered an arrest and torture as reprisal for [Djadjou's] activism in the struggle.

6)    That in fulfillment of my statutory responsibilities as chairman of the SCNC, I undertake the verification and confirmation of the affiliation of members, as well as this claim of persecution on account of their activities . . . . I have accordingly verified and confirmed the affidavit from Mr. Henry Nyaah, the Northern Zone Vice Chairman of the SCNC relating to her membership and activism in the SCNC struggle and I attest to it authenticity and credibility. The verification was done through a litany of telephone exchanges I had with Mr. Henry Nyaah.

* * *

We are compelled by credible and authentic evidence as well as verifiable facts from the home front to state without fear of contradiction that . . . sending [Djadjou] back to [Cameroon] will undoubtedly make her a palpable target for harassment, arrests, torture and she could possibly be killed . . . .

J.A. 369-371.

Although Njoh, the chairman of the Southern Cameroons National Council of America, was the affiant who attested to Djadjou's past persecution, including her 2000 arrest, Howard Njeck was appointed by Njoh to testify on behalf of Djadjou in Njeck's capacity as the Vice Chairman of the Southern Cameroons National Council of America. Njeck's testimony was primarily directed at providing further authenticating and corroborating details relevant to Njoh's affidavit. Njeck testified that he and Njoh contacted Yuna, an SCNC official based in Cameroon charged with keeping records of the details and circumstances of SCNC members arrested in Cameroon. Njeck reiterated that the Cameroonian SCNC official, Yuna, reviewed relevant records and confirmed, among other things, that Djadjou was arrested in 2000 for her SCNC activities.

Njeck further testified to the accuracy and reliability of Njoh's affidavit by explaining that the submission of affidavits by SCNC-USA in similar asylum proceedings is "something that [Njoh is] doing with a lot of people" and, consequently, ensuring accuracy and reliability in such affidavits is essential "[i]n terms of credibility" and "in the best interest of [SCNC-USA]" and for future asylum applicants that seek the support of SCNC-USA. J.A. 343.

According to the majority, "[t]he agency . . . refused to credit Njeck's testimony and Njoh's affidavit with respect to Djadjou's 2000 arrest and her husband's 1997 arrest." *Ante* at 20. The problem, however, is that the immigration judge and Board of Immigration Appeals made no such determination. Indeed, the immigration judge expressly found that "[i]nsofar as [Njeck] testified credibly with Mr. Njoh's [affidavit] this Court will find him credible." J.A. 102. Other than the immigration judge's positive determination of Njeck's credibility, the record is devoid of any specific, cogent reason(s) for the immigration judge to have discredited Njeck's testimony or Njoh's affidavit.

My review of the record reveals only four other findings from the immigration judge relevant to Njoh's affidavit or Njeck's testimony. First, the immigration judge noted that Njoh's affidavit "refers to [Djadjou] as having been arrested one time in 2000 . . . . [However, Djadjou] has no satisfactory explanation as to why the SCNC documents failed to mention her other arrests." J.A. 103. Although potentially relevant to the immigration judge's adverse credibility determination, the immigration judge's finding has no bearing on the reliability of Njoh's affidavit, which confirms Djadjou's arrest in 2000.

Second, the immigration judge noted "that the records from the SCNC that were purportedly examined by Mr. Yuna have not been provided to this Court. In sum, this omission is a significant omission." J.A. 103. This finding, however, to the extent that it is relevant to Djadjou's 2000 arrest, is erroneous

under this Court's precedent because: (1) a "'letter from [a] party leader' on behalf of a party member seeking asylum can corroborate the applicant's claims[,]" *Tassi*, No. 10-2194, slip op. at 18 (quoting *Camara*, 378 F.3d at 369); and (2) "[t]he [immigration judge] did not otherwise assess the probative value of . . . or evaluate the reliability of" Njoh's affidavit and Njeck's testimony. *Id.*

Third, the immigration judge found that "there are no records to corroborate the 2000 arrest of [Djadjou] . . . ." J.A. 103-104. However, given Njoh's affidavit that confirms the 2000 arrest and Njeck's testimony, which the immigration judge credited, this finding is unsupported and, indeed, appears to "distort or disregard important aspects of the [Djadjou's] claim." *Tassi*, No. 10-2194, slip op. at 13.

Fourth, the immigration judge made an ambiguous finding that "[p]erhaps [Djadjou] was an SCNC member in Cameroon as testified by Mr. Njeck." J.A. 107. If we are to take anything from this finding, it is a reaffirmation that the immigration judge regarded Njoh's affidavit as reliable and Njeck's testimony as credible.

Nonetheless, the immigration judge concluded that there "is simply no persuasive objective evidence that [Djadjou] was arrested." J.A. 108. Consequently, the immigration judge found "that the [Djadjou] has not suffered past persecution in Cameroon and accordingly there is no presumption of a well-founded fear of persecution should she return to that country." J.A. 108. The immigration judge arrived at this conclusion, which either rejected Djadjou's independent evidence or, alternatively, failed to consider that independent evidence separate and apart from the immigration judge's adverse credibility determination, without offering specific, cogent reasons why Djadjou's independent evidence was not reliable, in contravention of this Court's precedent.

In affirming the agency's decision, the majority "glean[s] an overall concern [of the immigration judge and Board of

Immigration Appeals] about the reliability of Njoh's and Njeck's statements [because] they attested to events of which they had no personal knowledge based on records that they had not reviewed and were not submitted." *Ante* at 20. To this end, the majority states that "the [Board of Immigration Appeals] essentially found that Njeck's and Njoh's statements were unreliable." *Ante* at 20. Given that this Court has held that speculation and conjecture are insufficient reasons to discount Djadjou's evidence, *Lin-Jian v. Gonzales*, 489 F.3d 182, 189 (4th Cir. 2007), it is confounding that the majority's speculation and conjecture of what the immigration judge and Board of Immigration Appeals "essentially found" and what the majority is able to "glean" from the cold record can form the basis of its decision to affirm.

It is interesting to note that, although the majority opinion repeatedly asserts that the Federal Rules of Evidence do not apply to immigration hearings and concedes that hearsay evidence is admissible in such proceedings (*Ante* at 20), the majority nonetheless strains to find a basis for the agency's non-existent "unreliability determination" in relation to Njoh's affidavit and Njeck's testimony by making an evidentiary finding that is no where to be found in the record: namely, that "the hearsay nature of [Njoh's affidavit and Njeck's testimony], which involved multiple levels of hearsay, contributed to the agency's concerns about their reliability." *Ante* at 20. Although this novel, well reasoned, and potentially persuasive evidentiary finding would be entitled to some consideration by this Court if issued by the immigration judge, it is not the product of either the immigration judge or the Board of Immigration Appeals. Instead, the majority "gleans" it to be so based upon its review of a cold record. In sum, while the record supports the immigration judge's adverse credibility determination, the record also shows that Djadjou presented independent evidence, separate and apart from her own testimony, that established her past persecution in Cameroon. The agency may not ignore such independent evidence, and the agency may not reject such independent

evidence solely on the basis of an adverse credibility determination. Nor may an appellate court "glean" a basis for rejecting independent evidence when no such basis is to be found in the decisions of the immigration judge or Board of Immigration Appeals. Accordingly, I respectfully dissent.