PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DENIS JAVIER ZELAYA,

*Petitioner,*

v.

ERIC H. HOLDER, JR., Attorney General,

*Respondent.*

No. 10-2401

On Petition for Review of an Order of
the Board of Immigration Appeals.

Argued: October 27, 2011

Decided: January 11, 2012

Before DAVIS and FLOYD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Petition for review denied in part, granted in part; vacated in
part and remanded by published opinion. Senior Judge Hamil-
ton wrote the opinion, in which Judge Davis and Judge Floyd
joined. Judge Floyd wrote a separate concurring opinion in
which Judge Davis joined.

## COUNSEL

**ARGUED:** Bryan Myerson Ward, SUTHERLAND ASBILL
& BRENNAN, LLP, Atlanta, Georgia, for Petitioner. Kerry

Ann Monaco, UNITED STATES DEPARTMENT OF JUS-TICE, Washington, D.C., for Respondent. **ON BRIEF:** Ame-lia T. Rudolph, Roshal L. Erskine, SUTHERLAND ASBILL & BRENNAN, LLP, Atlanta, Georgia, for Petitioner. Tony West, Assistant Attorney General, Civil Division, Linda S. Wernery, Assistant Director, Office of Immigration Litiga-tion, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

**OPINION**

HAMILTON, Senior Circuit Judge:

Denis Javier Zelaya (Zelaya), a native and citizen of Hon-duras, petitions for review of the final order of the Board of Immigration Appeals (the BIA) affirming the denial of his claims for asylum, withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Punishment (the CAT or CAT). We deny Zelaya's petition for review with respect to his asylum claim and his withholding of removal claim. How-ever, we grant his petition for review with respect to his CAT claim, vacate the BIA's final order with respect to such claim, and remand for further proceedings in accordance with this opinion.

I.

A.

In order to provide the necessary context for our statement of the relevant facts and procedural history, we now set forth an overview of the legal landscape relevant to Zelaya's peti-tion for review.

Under the Immigration and Nationality Act (the INA), the Attorney General has discretionary authority to "grant asylum

to an alien . . . if . . . the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of [Title 8]." 8 U.S.C. § 1158(b)(1)(A). Section 1101(a)(42)(A) in turn defines the term "refugee" as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group . . . ." *Id.* § 1101(a)(42)(A). "The burden of proof is on the applicant [for asylum] to establish that the applicant is a refugee, within the meaning of section 1101(a)(42)(A)." *Id.* § 1158(b)(1)(B).

Unlike in the asylum context, if an alien qualifies for withholding of removal under the INA, the Attorney General cannot remove him to his native country. *Id.* § 1231(b)(3)(A); *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004). "Withholding of removal is available under 8 U.S.C. § 1231(b)(3) if the alien shows that it is more likely than not that h[is] life or freedom would be threatened in the country of removal because of h[is] '. . . membership in a particular social group . . . .'" *Gomis v. Holder*, 571 F.3d 353, 359 (4th Cir. 2009) (quoting 8 U.S.C. § 1231(b)(3)(A)), *cert. denied*, 130 S. Ct. 1048 (2010). This is a higher burden of proof than for an asylum claim, although the facts that must be proven are the same. *Camara*, 378 F.3d at 367. Accordingly, an alien who cannot meet his burden of proof on an asylum claim under the INA necessarily cannot meet his burden of proof on a withholding of removal claim under the INA. *Id.*

The CAT, pursuant to its implementing regulations, prohibits the United States from returning any person to a country where the person has demonstrated that it is more likely than not that he will be tortured if returned to such country. United Nations Convention Against Torture, and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, p. 20, 1465 U.N.T.S. 85,

114. For purposes of obtaining protection under the CAT in the United States, torture is defined as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. §§ 208.18(a)(1) (Department of Homeland Security regulation), 1208.18(a)(1) (Executive Office for Immigration Review regulation).[1] A public official acquiesces to torture if, "prior to the activity constituting torture, [the public official] ha[s] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7). "The testimony of the applicant" for withholding of removal under the CAT, "if credible, may be

---

[1]The abolishment of the Immigration and Naturalization Service in 2003 and the concomitant transfer of its enforcement functions to the Department of Homeland Security led to the creation of a parallel set of immigration regulations for the Executive Office of Immigration Review, which office remains part of the Department of Justice. Homeland Security Act of 2002, Pub. L. 107-296, tit. IV, subtits. D, E, F, 116 Stat. 2135, 2192 (Nov. 25, 2002), as amended; 68 Fed. Reg. 9824-01 (February 28, 2003); Anwen Hughes, *Asylum and Withholding of Removal—A Brief Overview of the Substantive Law*, 205 Practicing Law Inst./NY 445, 477 n.1 (2011). Because Zelaya's asylum application took its path through the Executive Office of Immigration Review, from here forward, with the exception of our discussion in footnote 2, *infra*, we will only cite to the regulatory version specifically applicable to the Executive Office of Immigration Review.

sufficient to sustain the burden of proof without corroboration." *Id.* § 1208.16(c)(2).[2]

### B.

On January 19, 2007, Zelaya entered the United States illegally at the age of sixteen. Zelaya conceded his removability as charged in his notice to appear, but sought relief from removal by seeking asylum, withholding of removal, and protection under the CAT (collectively Zelaya's asylum application). Zelaya applied for asylum and withholding of removal

---

[2]During oral argument in the present appeal, the government adamantly denied that 8 C.F.R. § 208.16(c)(2), which is identical to 8 C.F.R. § 1208.16(c)(2), applies to CAT claims; instructing us that such regulation only applies in the asylum context. The government then went on to instruct us that the entirety of 8 C.F.R. § 208.16, which again is identical to 8 C.F.R. § 1208.16, applies only in the asylum context and that "there is nothing in the regulations that talk about corroboration in the CAT claim." We are baffled by the government's position in this regard because §§ 208.16 and 1208.16 could not be clearer that their respective subparagraph (c)(2)s apply to an application for withholding of removal under the CAT. Their main headings announce that their topics of coverage are "**Withholding of removal under section 241(b)(3)(B) of the [INA] and *withholding of removal under the Convention Against Torture*.**" 8 C.F.R. §§ 208.16, 1208.16 (underscore emphasis added). Drilling down, their respective headings of paragraph (c) state "*Eligibility for withholding of removal under the Convention Against Torture.*" *Id.* §§ 208.16(c), 1208.16(c). And, the entirety of their respective subparagraph (c)(2)s each state:

> The burden of proof is on the applicant for withholding of removal *under this paragraph* to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. *The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.*

*Id.* §§ 208.16(c)(2), 1208.16(c)(2) (emphasis added). In short, the government's position that the testimony of an applicant for withholding of removal under the CAT, if credible, is never sufficient to sustain his burden of proof without corroboration is unequivocally wrong in the face of the plain language of §§ 208.16(c)(2) and 1208.16(c)(2).

under the INA based upon his membership in a particular social group.[3]

On December 16, 2009, the immigration judge (the IJ) held an evidentiary hearing on Zelaya's asylum application. According to Zelaya's pre-hearing brief, he is entitled to asylum or withholding of removal under the INA because he has a well-founded fear of persecution on account of his membership in a particular social group consisting of young Honduran males who (1) refuse to join the Mara Salvatrucha 13 gang (MS-13), (2) have notified the authorities of MS-13's harassment tactics, and (3) have an identifiable tormentor within MS-13.

Zelaya grew up in the Honduran town of El Progresso, in the department of Yoro. Zelaya testified on his own behalf before the IJ during a hearing on his asylum application. When asked by his counsel to describe his life in El Progresso, Zelaya testified, as summarized in the IJ's written decision, that:

> [H]is life was horrible. From age 11 years old until he left he was pursued by gangs. He said that there were gangs everywhere he went. The MS-13 was the name of the gang. He is afraid of the gangs. He said the gangs threatened to kill him on several occasions. He said they threatened him because he does not want to join. He began to speak about being threatened because they accused him of dating a young girl. He said they wanted him to join the gang. They would hit him and beat him when they confronted him about his lack of desire to join the gang.

---

[3]He also applied for asylum and withholding of removal under the INA based upon his political opinions. Zelaya does not press his political opinions as a ground for asylum or withholding of removal under the INA in his petition for review of the BIA's final order. Accordingly, we do not address it further.

They threatened they would kill his brother if he did not join the gang. [Zelaya] continued to say that on one occasion they approached him in a park. They put a gun to his head and shot the gun. The gun was shot in front of his face. He said that he was bleeding. He testified that the gang member told him you are lucky I only have one bullet otherwise you would be dead. [Zelaya] said that he wanted to tell the police and he went to the police station and he filed a report. He said that the police told him that they could not help him because the gang members would hurt them as well. [Zelaya] said there was another incident when his friend Manuel called him to come out and meet him in a wooded area. He said when he arrived there he saw that Manuel was being beaten up by the gang. That Manuel's face was bruised and swollen. They hit him, meaning [Zelaya], in the stomach and threatened to kill him and his brother if he did not join the gang.

(J.A. 54-55).

Zelaya testified that all of the MS-13 gang members in his neighborhood were involved in harassing him. Although all nine would hit him, the "boss of the whole gang" in his neighborhood, named Jeffrey, would seek Zelaya out in particular. (J.A. 137). After the incident in the wooded area, Zelaya told MS-13 that he would think about joining. MS-13 then assured him that his friend Manuel would be fine.

Zelaya then went home and started thinking about coming to the United States, because he "was afraid they were going to kill [his] brother because [he] grew up with [his] brother and [his] mother." (J.A. 145). Zelaya fled Honduras for the United States soon thereafter. According to Zelaya, sometime after he arrived in the United States, he learned through a telephone call to his grandmother back in Honduras that MS-13

had shot and killed his friend Manuel because the gang wanted to know his whereabouts.

In addition to his own testimony, Zelaya submitted numerous documents in support of his asylum application, including, *inter alia*: (1) a copy of a March 11, 2009, press release issued by Campbell University recounting the 1997 kidnapping and murder of the son of then Honduran President Ricardo Maduro by MS-13 in Honduras; (2) an affidavit by Zelaya in which he describes in detail, *inter alia*, his early life in Honduras and MS-13's violent efforts at recruiting him and his friend Manuel; (3) an affidavit by Magdaleno Rose-Avilia, Chief of Party for the Miami Project of the International Relief Development Agency and researcher of gang life in Central America, opining, *inter alia*, that, given the attention and threats that Zelaya drew from MS-13 communicated to him through the targeting of his friends and relatives, Zelaya's "life is in danger and it is clear that [MS-13] has neither forgotten nor forgiven him," (J.A. 221); (4) the 2008 State Department country report on human rights practices in Honduras, reporting, *inter alia*, that abuse of youth and children by gangs in Honduras and corruption within all security forces in Honduras are serious problems; (5) a September 11, 2008 article published by the World Markets Research Center, reporting that Honduras is battling a high crime rate and violence, mainly blamed on the gangs; (6) written certification, dated September 25, 2007, by the Head of the Directorate General of Criminal Investigation for the city of El Progresso that, in the spring of 2006, Zelaya twice reported to the police that members of MS-13 had threatened to kill him if he did not join their gang; (7) a written certification, dated September 25, 2007, by a Honduran attorney named Olvin David Martinez Zelaya, stating that he accompanied Zelaya to the police station when he reported the death threats by MS-13 in the spring of 2006; and (8) a six-page report by a licensed psychologist, Max Nunez, MA, acknowledging, *inter alia*, Zelaya's accounts of MS-13's violent recruitment efforts toward him including the shooting incident in the park in the

spring of 2006 and concluding, *inter alia*, as a consequence of MS-13's assaults and threats against Zelaya, his family, and his friends, Zelaya had symptoms suggestive of post traumatic stress disorder.

In her written decision on Zelaya's asylum application, the IJ found Zelaya credible and stated her belief that Zelaya had been pursued by MS-13 prior to fleeing Honduras. She also stated that she was "very concerned about [Zelaya being killed if he returned to Honduras] and it is unfortunate, but the Court is not able to grant asylum merely because [Zelaya] is in fear of a gang." (J.A. 59). She went on to state:

> Unfortunately, there are gangs throughout Central America in all the countries there, and here even in the United States. The fear alone does not place [Zelaya] as a person eligible for political asylum. I find that the evidence presented today is clear about the troubling country conditions in Honduras. There is no dispute between either side or in the Court's mind that Honduras is a place full of violence, recklessness, and ineffective law enforcement officials. However, the law of asylum remains clear. [Zelaya] must establish that he is a member of a particular social group . . . in order to be granted political asylum. [Zelaya] has not demonstrated as such. He has not met his burden of proof in that regard.

(J.A. 59-60). The IJ then went on to deny Zelaya's withholding of removal claim because it was based upon the same facts as his asylum claim and a withholding of removal claim requires the applicant to meet a higher standard of proof than in the asylum context. The IJ denied Zelaya's CAT claim on the basis that Zelaya had not described events showing that it is more likely than not that he would be subject to torture if returned to Honduras. In this regard, the IJ pointed out that torture under the CAT requires the acquiescence or consent of a public official, which Zelaya had failed to demonstrate.

Zelaya appealed the IJ's decision to the BIA, continuing to press his asylum and withholding of removal claims under the INA based upon his membership in a particular social group and continuing to press his CAT claim. In a written decision and final order spanning less than two full pages, the BIA affirmed the IJ's decision on a *de novo* review of the issues presented and dismissed Zelaya's appeal. Notably, the BIA did not find any of the IJ's findings of fact or her credibility determination to be clearly erroneous. Zelaya timely filed his petition for review of the BIA's final order. In his petition for review, Zelaya challenges the BIA's affirmance of the IJ's denial of his claims for asylum and withholding of removal under the INA and his claim for protection against torture under the CAT. We address each in turn.

## II.

The BIA affirmed the IJ's denial of Zelaya's asylum claim on the ground that young Honduran males who refuse to join MS-13, have notified the authorities of MS-13's harassment tactics, and have an identifiable tormentor within MS-13 do not qualify as a "particular social group" under § 1101(a)(42)(A). According to the BIA, Zelaya's argument to the contrary is foreclosed by its precedential decision in *Matter of S-E-G*, 24 I. & N. Dec. 579 (BIA 2008).

In *Matter of S-E-G*, two brothers who had fled El Salvador in 2004, sought asylum in the United States on the ground that they had suffered persecution and had a well-founded fear of future persecution by the MS-13 gang in El Salvador on account of their being in the particular social group of young Salvadoran males who have resisted gang recruitment. *Id.* at 581. The BIA held that this proposed social group did not constitute a particular social group within the meaning of the INA because it lacked particularity and social visibility. *Id.* at 585-87.

In his petition for review, Zelaya does not challenge *Matter of S-E-G* as wrongly decided; rather, he argues that his pro-

posed social group is distinguishable from the proposed social group the BIA rejected in *Matter of S-E-G* because his proposed social group includes persons who notified the police of MS-13's harassment tactics and have a specific tormenter within MS-13. Indeed, he goes on to argue that the particular social group that we recently recognized in *Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011) compels the conclusion that his proposed social group constitutes a particular social group under the INA, and thus, the BIA should have granted his asylum claim.

We must uphold the denial of Zelaya's asylum claim unless such denial is "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). Here, the BIA's affirmance of the IJ's denial of Zelaya's asylum claim on the ground that his proposed social group does not constitute a particular social group under the INA is not manifestly contrary to the law nor an abuse of discretion. The BIA has defined persecution on account of membership in a particular social group, within the meaning of the INA, to mean "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic[,] . . . one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987) (internal quotation marks omitted). Furthermore, in addition to immutability, the BIA requires that a particular social group have social visibility, meaning that members possess characteristics visible and recognizable by others in the native country; be defined with sufficient particularity to avoid indeterminacy; and not be defined exclusively by the fact that its members have been targeted for persecution.[4] *Scatambuli v. Holder*, 558 F.3d 53, 59 (1st Cir. 2009).

---

[4]Although the Seventh Circuit has rejected the BIA's social visibility requirement, *Gatimi v. Holder*, 578 F.3d 611, 615-16 (7th Cir. 2009), the Fourth Circuit has not yet decided whether such requirement comports with the INA. *Crespin-Valladares*, 632 F.3d at 125 n.5. We have no occasion to do so in the present case.

The particular social group propounded by Zelaya is not materially distinguishable from the one rejected by the BIA in *Matter of S-E-G* and is materially distinguishable from the one we recognized in *Crespin-Valladares*. For analytical purposes, we begin with *Crespin-Valladares*.

In *Crespin-Valladares*, we considered whether the proposed group of family members of those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses against the gangs qualify as a particular social group within the meaning of the INA. 632 F.3d at 124-26. We held that it does. *Id.* In reaching this holding, we held that the family bonds of the proposed group satisfied the BIA's immutable characteristic requirement, *id.* at 124-25, the self-limiting nature of the family unit satisfied the particularity requirement, *id.* at 125, and the easily recognizable innate characteristic of family relationship satisfied the social visibility requirement, *id.* at 125-26.

In contrast to the social group recognized in *Crespin-Valladares*, Zelaya's proposed social group does not have the immutable characteristic of family bonds. Similarly, Zelaya's proposed social group does not have the self-limiting feature of the family unit, which feature was critical to our holding in *Crespin-Valladares* that the proposed social group in that case had particular and well-defined boundaries, such that it constituted a discrete class of persons. *Id.* at 125. Finally, Zelaya's proposed social group does not have the easily recognizable innate characteristic of family relationship.

Zelaya never comes to grips with these material distinctions between his proposed social group and the one we recognized in *Crespin-Valladares*. Rather, he seems to be under the misimpression that, in addition to recognizing the social group of family members of those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses against the gangs, we also recognized in *Crespin-Valladares* that the complaining witness himself was part of the protected social

group. Zelaya patently misreads *Crespin-Valladares* in this regard. Indeed, we made clear in *Crespin-Valladares* that the particular social group proposed by the alien family in that case did not include the family member who agreed to be the prosecutorial witness; rather, it only included the family members of such witness. *Id.* at 125 ("Crespins' proposed group excludes persons who merely testify against MS–13; the Crespins' group instead encompasses only the relatives of such witnesses, testifying against MS–13, who suffer persecution on account of their family ties.").

The critical problem with Zelaya's proposed social group for purposes of seeking asylum is that it fails the BIA's particularity requirement. First, as we have previously recognized, opposition to gangs is an amorphous characteristic providing neither an adequate benchmark for determining group membership nor embodying a concrete trait that would readily identify a person as possessing such a characteristic. *Lizama v. Holder*, 629 F.3d 440, 447 (4th Cir. 2011). Resisting gang recruitment is similarly amorphous, *id.*, and the fact that Zelaya's conduct in resisting recruitment included complaining twice to the police adds little to the particularity equation in the face of the common sense proposition that MS-13 would look unfavorably upon anyone who complained about its harassment tactics to the police. Similarly, the concept that a person who is victimized by one gang member more than by other gang members somehow serves to particularize all such persons into a targeted social group is just nonsensical. For these reasons, Zelaya's proposed social group is materially indistinguishable from the one rejected by the BIA in *Matter of S-E-G*.

In sum, the BIA's conclusion that Zelaya's proposed social group of young Honduran males who refuse to join MS-13, have notified the police of MS-13's harassment tactics, and have an identifiable tormentor within the gang does not qualify as a particular social group within the INA is not manifestly contrary to the law or an abuse of discretion. *Cf.*

*Ramos-Lopez v. Holder*, 563 F.3d 855, 859-61 (9th Cir. 2009) (upholding BIA's determination that young Honduran men who resist being recruited into gangs do not constitute a particular social group within the INA). Accordingly, we affirm the BIA's affirmance of the IJ's denial of Zelaya's asylum claim.

## III.

Because Zelaya is ineligible for asylum under the INA, he necessarily fails the more stringent standard of proof for withholding of removal under the INA. *Yi Ni v. Holder*, 613 F.3d 415, 427 (4th Cir. 2010); *Camara*, 378 F.3d at 367. Accordingly, we affirm the BIA's affirmance of the IJ's denial of Zelaya's withholding of removal claim under the INA.

## IV.

Lastly, we address Zelaya's CAT claim. We begin by reiterating that, unlike his claims for asylum and withholding of removal under the INA, Zelaya qualifies for protection under the CAT if he can prove that, whatever the motivation, it is more likely than not that he would be tortured if removed to Honduras. *Jian Tao Lin v. Holder*, 611 F.3d 228, 236 (4th Cir. 2010); 8 C.F.R. § 1208.16(c)(2). For purposes of obtaining protection under the CAT in the United States, torture is defined, in relevant part, as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him . . . for an act he . . . has committed . . . , or intimidating or coercing him . . . , when such pain or suffering is inflicted . . . with the . . . acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). And a public official acquiesces in torture if, "prior to the activity constituting torture, [the public official] ha[s] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7).

Here, based upon the documentary evidence submitted by Zelaya and Zelaya's testimony, the IJ made the following findings of fact which are relevant to Zelaya's CAT claim: (1) Zelaya is a credible witness; (2) Zelaya consistently resisted MS-13's recruitment efforts and, as a result, MS-13 consistently pursued him until he fled Honduras at the age of sixteen, including beating him, threatening to kill him on several occasions, threatening to kill his brother, and shooting at him; (3) Zelaya continues to be in fear of MS-13; (4) when Zelaya reported the shooting incident in person to the local police with blood streaming down his face, a police officer told him that the police could not help him because MS-13's members would hurt them as well; (5) Honduras is a place full of violence, recklessness, and ineffective law enforcement officials; and (6) the IJ was very concerned that Zelaya would be killed by MS-13 if he is returned to Honduras.

Having found none of the IJ's findings of fact to be clearly erroneous, the BIA conducted a *de novo* review of Zelaya's CAT claim. The entirety of the BIA's specific discussion of Zelaya's CAT claim in its written decision is as follows:

> We also affirm the Immigration Judge's denial of protection under the Convention Against Torture ("CAT"). We agree with the Immigration Judge that the respondent has failed to establish that it is more likely than not that he will be subject to torture in Honduras that would be inflicted by or with the acquiescence (to include the concept of willful blindness) of a public official or other persons acting in an official capacity (I.J. at 17). *See* 8 C.F.R. §§ 1208.16(c)(2) and 1208.18(a)(1).

(J.A. 4).

What is clear to us is that the BIA did not take issue with the IJ's grave concern that Zelaya would be killed by MS-13 if he is removed to Honduras. What is not clear to us, how-

ever, is why the police officer's ultimate refusal to help Zelaya in any way when he reported that he had just been threatened with a gunshot by a member of MS-13 for resisting MS-13's recruitment efforts does not satisfy Zelaya's burden of proving that it is more likely than not that if Zelaya is removed to Honduras, he would endure severe pain or suffering, whether physical or mental, intentionally inflicted on him for such purposes as punishing him for resisting MS-13 recruitment or coercing him into joining MS-13, with the awareness of the local police that this would take place and the breach of the local police's legal responsibility to intervene to prevent it from happening. *See* 8 C.F.R. § 1208.16(c)(2) ("The testimony of the applicant" for withholding of removal under the CAT, "if credible, may be sufficient to sustain the burden of proof without corroboration.").

The BIA's answer to this issue and reasoned explanation is necessary before we can meaningfully review the BIA's decision regarding Zelaya's CAT claim. The BIA abused its discretion by failing to address the critical issue we have outlined and by failing to give a reasoned explanation for why the facts of this case do not satisfy the regulatory definition of "[a]quiescence of a public official," for purposes of analyzing a CAT claim. *Id.* § 1208.18(a)(7). *See Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011) ("The BIA may be held to have abused its discretion if it failed to offer a reasoned explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim."). Where "a BIA order does not demonstrate that the agency has considered an issue, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Nken v. Holder*, 585 F.3d 818, 822 (4th Cir. 2009) (internal quotation marks omitted). *See also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (requiring that "the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained"). Here, the proper course is to send Zelaya's CAT claim back to the BIA for additional investigation and explanation as we have outlined.

V.

In conclusion, we: (1) deny Zelaya's petition for review with respect to his asylum and withholding of removal claims under the INA; (2) grant Zelaya's petition for review with respect to his CAT claim; (3) vacate the BIA's decision to the extent it denies Zelaya's CAT claim; and (4) remand for further proceedings consistent with this opinion.

*PETITION FOR REVIEW DENIED*
*IN PART, GRANTED IN PART;*
*VACATED IN PART AND REMANDED*

FLOYD, Circuit Judge, concurring:

I concur in the well-crafted majority opinion. I write separately simply to address what I perceive as lingering confusion regarding the implications of our holding in *Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011). In my view, Judges Bea and Ripple, concurring in *Henriquez-Rivas v. Holder*, No. 09–71571, 2011 WL 3915529 (9th Cir. Sept. 7, 2011) (unpublished), were correct in the following observation:

> It should be noted that the proposed social group in *Crespin* included only *family members* of [prosecution witnesses against gangs] and not the witnesses *themselves*. However, to my mind, if the family members of witnesses are deemed socially visible and particular, the witnesses themselves—a more particular *and* socially visible and smaller class of people—must, *a fortiori*, meet those requirements as well.

*Id.* at *5 n.5. That is, to the extent members of a particular, socially visible group are defined by their relationship to another person or group of people, this person or group presumably also satisfies the particularity and social visibility

criteria. It may be, of course, that "prosecution witnesses against gangs" do not constitute a "particular social group" for some reason other than particularity or social visibility, but I am of the opinion that *Crespin-Valladares* is properly read to indicate that such a group satisfies these criteria in the same manner that "family members of prosecution witnesses against gangs" do.*

Thus, while I agree that Zelaya's proposed social group is insufficiently particular, I reach this conclusion not because the members of the proposed group lack kinship ties, but rather because the characteristics of the group are, in my view, broader and more amorphous than a group consisting of individuals who have testified for the government in formal prosecutions of gangs. As the lead opinion deftly explicates, Zelaya's conduct in twice contacting the police has failed to materially distinguish this case from *Matter of S-E-G-*, 24 I. & N. Dec. 579 (BIA 2008). For this reason, I concur in the denial of Zelaya's petition for review with respect to his asylum and withholding of removal claims.

Judge Davis has authorized me to indicate that he joins in this opinion.

---

*To be clear, I am not expressing an opinion on whether we should find that the social visibility requirement comports with the INA or, alternatively, should join the Seventh Circuit in rejecting this requirement, *see Gatimi v. Holder*, 578 F.3d 611, 615–16 (7th Cir. 2009). We did not reach this issue in *Crespin-Valladares*, 632 F.3d at 125 n.5, and we have no occasion do so here. In *Crespin-Valladares*, we determined only that, if a cognizable social group must be socially visible, the "family members" group fulfills this criterion. *Id.* at 125–26 & n.5. I believe it follows from *Crespin-Valladares* that, to the extent we impose a social visibility requirement, the group "prosecution witnesses against gangs" also satisfies this criterion.