UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-1491**

_____

JORGE SOLOMON-MEMBRENO, a/k/a Jorge Mauricio Membreno;
FATIMA MARLENE VILLANUEVA-MEMRENO,

        Petitioners,

        v.

ERIC H. HOLDER, JR., Attorney General,

        Respondent.

_____

On Petition for Review of an Order of the Board of Immigration
Appeals

_____

Argued: May 14, 2014                  Decided: July 23, 2014

_____

Before NIEMEYER and WYNN, Circuit Judges, and Robert J. CONRAD,
Jr., United States District Judge for the Western District of
North Carolina, sitting by designation.

_____

Affirmed by unpublished opinion. Judge Conrad wrote the opinion
in which Judge Niemeyer and Judge Wynn joined. Judge Wynn wrote
a concurring opinion.

_____

**ARGUED:** Ivan Yacub, Falls Church, Virginia, for Petitioners.
Liza S. Murcia, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Respondents. **ON BRIEF:** Rachel Petterson, LAW OFFICE
OF IVAN YACUB, Falls Church, Virginia, for Petitioners. Stuart
F. Delery, Assistant Attorney General, Anthony C. Payne, Senior
Litigation Counsel, Office of Immigration Litigation, Civil
Division, UNITED STATES DEPARTMENT OF JUSTICE, Civil Division,
Washington D.C., for Respondent.

_____

CONRAD, District Judge:

Petitioners Jorge Solomon-Membreno (Jorge) and Fatima Marlene Villanueva-Membreno (Fatima) (collectively: the siblings) are siblings who are natives and citizens of El Salvador. They appeal a final order from the Board of Immigration Appeals (BIA) affirming denial of their claims for asylum and withholding of removal by an Immigration Judge (IJ). Though related, the claims of the siblings are not identical. Jorge claims that he fears violent persecution by gang members because of his membership in a self-described social group of "young Salvadoran students who expressly oppose gang practices and values and wish to protect their family against such practices." Fatima bases her claim on her membership in a social group composed of "young female students who are related to an individual who opposes gang practices and values." Focusing primarily on Jorge's claim, the BIA affirmed denial on the grounds that they were too amorphous to qualify as a "particular social group," and were therefore not cognizable under the Immigration and Nationality Act (INA). We agree and affirm.

I.

A.

The rapid growth of violent gangs such as MS—13 has proved nothing short of a tragedy for those living in Central America.

Like a malign specter, the reach of MS—13 extends from city to town to countryside and oppresses the daily lives of innumerable people through intimidation, harassment, and staggering acts of violence. The son of the president of Honduras is among those who have been killed by MS—13. Countless more victims have been beaten, raped, or tortured at the hands of gang members; yet still more endure lives constricted by fear of such fates. Despite aggressive measures by national authorities, gang violence continues more or less unabated.[1] At the local level, authorities too often lack the resources, ability, or resolve to combat MS—13 effectively, still less to protect citizens and their families. For too many, the only way to escape the gang is to flee home altogether.[2] This is the unhappy backdrop to this case.

B.

---

[1] A recent study conducted by the World Bank supports a finding that Guatemala, Honduras, and El Salvador have the highest homicide rates in the world, approaching 100 persons per 100,000 in certain areas. Crime and Violence in Central America: A Development Challenge, at 3, (2011), available at: http://issuu.com/world.bank.publications/docs/crime_and_violence_in_central_america_en (saved as an ECF Opinion Attachment).

[2] The plague that is MS—13 is not limited to Central America but has made significant inroads into the United States. A complete list of federal criminal cases involving MS—13 members would be prohibitively long. A cursory sample, however, reveals something of the breadth of the gang's criminal activity. See e.g., U.S. v. Palacios, 677 F.3d 234 (4th Cir. 2012) (murder in aid of racketeering); U.S. v. Umana, 750 F.3d 320 (4th Cir. 2014) (two counts of murder while using firearm); U.S. v. Lobo-Lopez, 468 Fed. Appx. 186 (4th Cir. 2012)(conspiracy to commit murder in aid of racketeering); U.S. v. Rivera, 405 F.Supp.2d (E.D.Va. 2005) (killing a person aiding a federal investigation); U.S. v. Martinez, 978 F.Supp.2d 177 (E.D.N.Y. 2013) (multiple counts of murder); U.S. v. Escobar, 462 Fed. Appx. 58 (2d Cir. 2012) (use of explosives to commit a felony); U.S. v. Ramos-Carillo, 511 Fed. Appx. 739 (10th Cir. 2013) (conspiracy to distribute methamphetamine).

3

The facts, summarized briefly, are taken from the administrative record. The siblings grew up in their grandmother's house in Sensuntepeque, El Salvador, a town containing the presence of the MS-13 gang. The gang members were easily recognizable to the residents of the town as they wore distinct tattoos and perpetrated frequent acts of violence on members of the community, including robbery, assault, and arson. At some point during his adolescence, MS-13 members tried to recruit Jorge, but he refused to join as he did not approve of their activities.

In May 2003, when she was eleven years old, Fatima was attacked while walking home from school. Taking a shortcut through a wooded area, she heard unfamiliar voices, was seized from behind, was struck by a blow to the side of her face, and fell unconscious. She awoke to find her blouse ripped, her chest exposed, and her shirt raised. She felt pain in her stomach, believed she had been raped, and thought MS-13 members responsible as they had previously made sexual comments to her and threatened to "get her."

Jorge was eighteen years old at the time. When Fatima explained to him that she believed she had been raped by gang members, Jorge, accompanied by two friends, confronted the gang members in a location where they frequently congregated. As townspeople watched, Jorge yelled at the gang members, who

4

responded by punching and kicking him. After a few minutes, Jorge ran home to safety, but did not call the police as he believed they would do nothing. Thereafter, the siblings lived in constant fear of the gang, eventually moving in with their aunt for several months before returning to their grandmother's home as their aunt's house was too crowded. Returning to Sensuntepeque, they confined themselves to their grandmother's house for fear of encountering the gang members.

Jorge was the first of the siblings to flee El Salvador, leaving Fatima with her grandmother. Several months later, Fatima awoke to find that her grandmother's house had caught fire. Although she did not have conclusive proof, Fatima believed that MS–13 started the fire and filed a police report with the local authorities stating as much.

In March 2004, Jorge entered the United States near Tecate, California, where he was promptly served by the Department of Homeland Security (DHS) with a Notice to Appear (NTA) in removal proceedings. In August 2004, Fatima entered the United States near Hidalgo, Texas, and the following month the DHS served her with a similar notice. Jorge admitted the allegations in the NTA and conceded removability, but requested relief in the form of asylum, withholding of removal, and protection under the Convention Against Torture (CAT). At a later hearing, the IJ joined Jorge's and Fatima's cases, including their applications

5

for asylum and withholding of removal.

C.

On May 2, 2007, the IJ granted the Petitioners' applications for asylum, finding that they provided sufficient evidence to support their claims. Specifically, the IJ found Jorge's particular social group as "young Salvadoran students who expressly oppose gang practices and values and wish to protect their family against such practices," and Fatima's social group as "young female students who are related to an individual who opposes gang practices and values."

On review, the BIA sustained the DHS's appeal in July 2009, and remanded the record to the IJ for further adjudication consistent with its opinion. The BIA concluded that the IJ's decision conflicted with the holdings of the intervening cases of Matter of S-E-G-, 24 I. & N. Dec. 579 (BIA 2008) and Matter of E-A-G-, 24 I. & N. Dec. 591 (BIA 2008); consequently, the IJ's findings that the Petitioners belonged to particular social groups and that they had a well-founded fear of persecution based on such membership, did not square with the BIA's decisions in similar cases. For this reason, the BIA determined that the Petitioners failed to meet both the lower burden of proof to establish asylum as well as the more rigorous clear probability standard for withholding of removal. Nonetheless, the BIA remanded the case so that the IJ could consider two

6

alternate claims brought by Petitioners, namely a claim for asylum based on alternate political opinion and for protection under the Convention Against Torture (CAT).

On remand, the Petitioners withdrew their political opinion and CAT claims. Instead, citing this Court's opinion in Crespin-Valladares v. Holder, 632 F.3d 117 (4th Cir. 2012) as intervening law, they requested that the IJ adjudicate anew their claims for asylum based on their respective particular social groups. Not persuaded, the IJ denied their claims, finding them to be in conflict with existing BIA precedent.

Reviewing the case for the second time, the BIA in March 2013 affirmed the IJ's denial and dismissed Petitioners' claims for asylum. In so holding, the BIA examined Petitioners' claims in light of recent decisions from this Court, distinguishing the facts of this case from those in Crespin-Valladares, where the family of the petitioner was more readily identifiable as the asylum petitioner and his uncle agreed to testify at the trial of gang members who had killed a relative. 632 F.3d at 126. In contrast, the BIA likened the facts of this case to those in Zelaya v. Holder, 668 F.3d 159 (4th Cir. 2012) where this Court found that young Honduran males who refused to join gangs, had notified the authorities of gang harassment tactics, and had a readily identifiable tormentor within the gang did not constitute a cognizable social group.

Accordingly, the BIA issued a final order of deportation, which this Court now reviews.

## II.

Section 106(a) of the Immigration and Nationality Act vests federal appellate courts with jurisdiction to review "final orders of deportation." 8 U.S.C. § 1252(a)(1). Final orders are entered only after all administrative remedies have been exhausted; thus, final orders in deportation proceedings are generally made by the BIA following appeal from the immigration judge. See Camara v. Ashcroft, 378 F.3d 361, 366 (4th Cir. 2004). Where, as in this case, the BIA issued its own opinion without adopting the IJ's opinion in whole or in part, review by this Court is limited to the BIA's opinion. Martinez v. Holder, 740 F.3d 902, 908 n.1 (4th Cir. 2014). The BIA's decision, therefore, constitutes the final order of removal, and we review that opinion and not the opinion of the IJ. The BIA's legal determinations, including its interpretation of the INA and other regulations, are reviewed de novo. See Li Fang Lin v. Mukasey, 517 F.3d 685, 691-92 (4th Cir. 2008).

Individuals qualify for asylum if they demonstrate that they are subject to persecution or have a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). This Court upholds the denial of an

8

asylum claim unless such denial is "manifestly contrary to law and an abuse of discretion." Zelaya, 668 F.3d at 165 (quoting 8 U.S.C. § 1252(b)(4)(D)).

The BIA recognizes a particular social group when it satisfies three criteria: (1) its members share common, immutable characteristics; (2) the common characteristics give its members social visibility; and, (3) the group is defined with sufficient particularity to delimit its membership. Lizama v. Holder, 629 F.3d 440, 447 (4th Cir. 2011) (internal citations omitted). After Lizama was issued, the BIA clarified the term "social visibility" to mean "social distinction," as the former term risked misapprehension as merely ocular or actual visibility, whereas the latter directs focus on the full range of qualities capable of rendering a group distinct within a society. Matter of W-G-R-, 26 I. & N. Dec. 2008 (BIA Feb. 7, 2014).

## III.

The discrete question in front of us is whether the following groups qualify as particular social groups:

(Jorge): "young Salvadoran students who expressly oppose gang practices and values and wish to protect their families against such practices"; and

(Fatima): "young female students who are related to an individual who opposes gang practices and values."

In addressing this question, our analysis is directed by

9

numerous prior decisions of this Court and the BIA, which have examined the proposed social groups of persons seeking asylum due to persecution at the hands of MS-13.

The BIA has found that a group comprised of Salvadoran youth who have been recruited by MS—13, but resisted joining was too amorphous to qualify as a particular social group as "the motivation of gang members in recruiting and targeting young males could arise from motivations quite apart from any perception that the males in question were members of a class." Matter of S-E-G-, 24 I. & N. at 585. Similarly, a class of young persons perceived to be affiliated with gangs based on the incorrect perceptions of others likewise cannot be identified as a particular social group. Matter of E-A-G-, 24 I. & N. at 596.

In Lizama, this Court declined to recognize a proposed social group consisting of "young, Americanized, well-off Salvadoran male deportees with criminal histories who oppose gangs." 629 F.3d at 447. In reaching this conclusion, the Court found that factors such as wealth, Americanization and opposition to gangs were amorphous characteristics that failed "to provide an adequate benchmark for determining group membership" as such factors did not "embody concrete traits that would readily identify a person as possessing these characteristics." Id. (internal citations omitted). This Court followed the exact same line of reasoning in Zelaya, finding

10

that a proposed group comprised of young, Honduran males who refused to join MS—13, notified the authorities about harassment tactics, and had an identifiable tormentor within MS—13, was too amorphous a class to satisfy the particularity requirement. 668 F.3d at 166 (citing Lizama, 629 F.3d at 447).

In Crespin-Valladares, by contrast, this Court found that a social group consisting of family members of persons who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses constituted a particular social group. The discrete issue in Crespin-Valladares centered upon the class of family members rather than the actual persons who agree to serve as witnesses. Nonetheless, the Court did not view these classes in isolation from each other, observing that: "we can conceive of few groups more readily identifiable than the family . . . [and] [t]his holds particularly true for Crespin's family, given that Crespin and his uncle publicly cooperated with the prosecution of their relative's murder." Crespin-Valladares, 632 F.3d at 126.

Petitioners contend that the BIA erred by expanding on Crespin-Valladares insofar as that opinion was limited to the discrete question of eligibility of the family members as a particular social group. Although they are correct that the holding in Crespin-Valladares ventures no further than to recognize the status of family members per se as a particular

11

social group, and that the opinion offers no account of how the manifold forms of opposition to gangs might inform the boundaries of a particular social group, it does not naturally follow that such considerations are beyond the purview of a reviewing court. Crespin-Valladares establishes that the family members constitute a particular social group by virtue of their relationship to persons who agree to testify at trial against gang members. Reading this case as mandating that the claims of family members be viewed in isolation to one another risks yielding the absurd result whereby family members of persons testifying at trial might qualify as a particular social group while the persons testifying do not.

Subsequent decisions from this Court have laid to rest any doubts about the implications of the holding in Crespin-Valladares. Quoting language from a concurring opinion from the Ninth Circuit, Judge Floyd, joined by Judge Davis, addressed this issue in Zelaya, stating that:

> It should be noted that the proposed social group in Crespin [Crespin-Valladares] included only *family members* of [prosecution witnesses against gangs] and not the witnesses *themselves*. However, to my mind, if the family members or witnesses are deemed socially visible and particular, the witnesses themselves—a more particular *and* socially visible and smaller class of people—must, *a fortiori*, meet those requirements as well.

668 F.3d at 169 (quoting Henriquez-Rivas v. Holder, No-09-71571, 449 Fed.Appx. 626, 632 n.5 2011 WL 3915529, at *5 n.5 (9th Cir. Sept. 7, 2011)) (unpublished).

12

For this reason, the BIA did not err in comparing unfavorably Jorge's public confrontation with the public testimony of gang members at issue in Crespin-Valladares. In fact, this Circuit drew the same comparison in Zelaya, a case involving a proposed social group comprised of young, Honduran males who refused to join MS-13, notified the authorities about harassment tactics, and had an identifiable tormentor within the gang. Finding that the proposed group failed the particularity requirement, Judge Floyd stated the following:

> Thus while I agree that Zelaya's proposed social group is insufficiently particular, I reach this conclusion not because the members of the proposed social group lack kinship ties, but rather because the characteristics of the group are, in my view, broader and more amorphous than a group consisting of individuals who have testified for the government in formal prosecutions of gangs.

Zelaya, 668 F.3d at 169.

Indeed, all of this is a somewhat technical prelude to the most important distinction in this case, namely particularity. A particular social group must have "particular and well established boundaries." Zelaya, 668 F.3d at 166. Here, the proposed social groups lack well-established boundaries; that is to say they provide no means to distinguish among the panoply of actions a person might take in opposition to MS—13. Instead, the proposed groups regard as an undifferentiated class all conceivable forms of public opposition to gangs, to include, for

13

example, the filing of a police report, making statements against the gang to local media, participation in a city-wide protest against the gang, or, as discussed during oral arguments, public criticism of gang activity by a bishop during a religious service. While different in material respects, all of these are acts of public opposition to gangs falling squarely within the proposed social group. Like Zelaya, the proposed group is too amorphous as it fails "to provide an adequate benchmark for determining group membership." 629 F.3d at 447.

IV.

For the foregoing reasons, we affirm the BIA's order denying Petitioners' claims for asylum.

AFFIRMED

14

WYNN, Circuit Judge, concurring in the judgment:

I agree with the majority's conclusion that the siblings' proposed social groups are not particular enough to render them eligible for asylum. I further agree that we should deny the petition for review. Put simply, Zelaya v. Holder, 668 F.3d 159 (4th Cir. 2012), and Lizama v. Holder, 629 F.3d 440 (4th Cir. 2011), dictate the outcome here. In those cases, we held that "opposition to gangs [is an] amorphous characteristic[]" that cannot be used to determine group membership, Lizama, 629 F.3d at 447, and that "[r]esisting gang recruitment is similarly amorphous," Zelaya, 668 F.3d at 166. Jorge's one public altercation with gang members does not turn him or his sister into members of any "particular social group" that is eligible for asylum under 8 U.S.C. § 1101(a)(42)(A).

Although I think that we should clear up the "lingering confusion regarding the implications of our holding in Crespin-Valladares v. Holder, 632 F.3d 117 (4th Cir. 2011)," Zelaya, 668 F.3d at 169 (Floyd, J., concurring in judgment), this case is not the vehicle for doing so. In Crespin-Valladares, we held that family members of those who testify against gangs are members of a "particular social group." Crespin-Valladares, 632 F.3d at 126. We did not reach the question of whether prosecution witnesses, themselves, constitute a particular social group. Like Judge Floyd and Judge Davis, I would read

15

Crespin-Valladares "to indicate that such a group satisfies [the relevant criteria] in the same manner that family members of prosecution witnesses against gangs do." Zelaya, 668 F.3d at 169 (Floyd, J., concurring in judgment) (quotation marks omitted).

Of course, such a reading has no bearing on the outcome of this case. Even if we were to assume that prosecution witnesses are members of a "particular social group," Jorge's conduct in publicly confronting several gang members on one occasion is analogous to the conduct in Zelaya, which consisted of twice contacting the police. Id. at 166. Because Fatima's proposed social group—"young female students who are related to an individual who opposes gang practices and values"—is derivative of the insufficiently particular social group of her brother, her petition for review must fail as well.

16