<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 11-1699**

---

THOMAS DECZEM BASSANGUEN,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

---

On Petition for Review of an Order of the Board of Immigration Appeals.

---

Argued: September 20, 2012      Decided: February 27, 2013

---

Before TRAXLER, Chief Judge, DAVIS, Circuit Judge, and Max O. COGBURN, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

---

Petition granted in part; vacated and remanded by unpublished per curiam opinion. Judge Davis wrote a separate opinion concurring in the judgment.

---

**ARGUED:** Danielle L. C. Beach-Oswald, BEACH-OSWALD IMMIGRATION LAW ASSOCIATES, PC, Washington, D.C., for Petitioner. Justin Robert Markel, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Tony West, Assistant Attorney General, Civil Division, Carl H. McIntyre, Assistant Director, UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Washington, D.C., for Respondent.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Thomas Deczem Bassanguen is a native and citizen of Cameroon. He was admitted into the United States under a nonimmigrant visitor's visa on July 5, 2005, with authorization to remain in the United States until September 4, 2005. He subsequently filed an affirmative application for political asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied all forms of relief sought by Bassanguen, based upon an adverse credibility determination, and the Board of Immigration Appeals ("BIA") affirmed. Bassanguen now petitions this court for review of the decision of the BIA. For the reasons that follow, we grant the petition for review in part, vacate the BIA's order, and remand for reconsideration.

I.

A.

In his application for relief, Bassanguen claims to be a member of the Social Democratic Front ("SDF"), an opposition party in Cameroon. He asserts that he was arrested and subjected to persecution because of his SDF membership on three separate occasions.

First, Bassanguen testified that he was arrested on May 24, 1997, detained for three days, and subjected to inhumane and

3

humiliating conditions during the detention.  For example, he claimed that he was forced to undress to his underwear, confined in a urine-saturated cell with no sanitation facilities, and forced to lie on a cement floor, which caused him to experience nausea, vomiting, and pain.

Second, Bassanguen testified that he was arrested on June 30, 2002, and detained for five days.  He claimed that he was subjected to similar inhumane conditions, as well as repeated, brutal beatings and kickings by prison officials.  He claimed that, after he was released, he experienced pain and difficulty walking as a result of the beatings he sustained during this detention.  In December 2002, Bassanguen traveled from Cameroon to Nigeria and, following a ten-day stay, voluntarily returned to Cameroon without difficulty or arrest.

Bassanguen testified that he was arrested for the third and final time on November 6, 2004, and detained for eight days.  He testified that he was again subjected to inhumane conditions, including being forced to carry buckets of urine from the cells and being subjected to repeated beatings.  He testified that he escaped from this detention with the help of a police officer, but he offered contradictory testimony as to whether he was also assisted and accompanied by his lawyer during the escape. Shortly thereafter, Bassanguen went to the United States Embassy

4

in Cameroon and was issued a nonimmigrant visitor's visa. He arrived in the United States on July 5, 2005.

Bassanguen asserts that he is eligible for asylum based on the three incidents of arrest and past persecution as well as a fear of future persecution if he returns to Cameroon. Bassanguen testified that he has remained a member of the SDF party in the United States since his arrival here and that he fears the Cameroonian government has been made aware of his activities. Bassanguen testified that he attended his first SDF meeting in the United States in August 2005, that he has participated in one demonstration in this country, and that he has attended as many as five more SDF meetings since August 2005. He testified that the last meeting he attended was in November 2009, approximately two months prior to the hearing before the IJ.

In addition to his own testimony, Bassanguen presented the testimony of Dr. Mary Cogar, a clinical psychologist, and Enid Duplex Kuissu, a fellow SDF member. He also submitted a number of documents and letters from family members and SDF officials.

B.

On March 19, 2012, the IJ issued an oral decision denying Bassanguen's applications for asylum, withholding of removal, and protection under the CAT, and ordering Bassanguen removed to Cameroon. Applying the REAL ID Act of 2005, the IJ found that

5

Bassanguen "was not sufficiently credible in his testimony." J.A. 279. In support, the IJ cited the following inconsistencies and inaccuracies in Bassanguen's evidence, in conjunction with "unrebutted evidence which reflects random fraud of certain documents coming out of Cameroon." J.A. 277.

Bassanguen submitted documents purported to be from his wife, who remained in Cameroon. Bassanguen admitted, however, that the signature on at least one of the documents did not appear to be the signature of his wife, which the IJ found to be "fundamentally dishonest." J.A. 274. Later in his testimony, Bassanguen speculated that his wife may have deliberately changed her signature out of fear of retaliation by the Cameroonian government, but the IJ found this explanation not credible because the document clearly designated Bassanguen's wife as the author of the letter, regardless of the signature.

Bassanguen submitted letters from an SDF official in Cameroon that contained inconsistent information. The first letter contained inaccuracies about Bassanguen's activities that a second letter attempted to correct, but the second letter provided no explanation as to why the errors had occurred in the first place. The letters submitted were purportedly from the same SDF official in Cameroon, but were on different letterheads. Also, Bassanguen's SDF membership card contained

6

different issue dates, which Bassanguen could only attribute to an unexplained mistake.

A letter purportedly written by a leader in the SDF party, Chief Taku, regarding Bassanguen's third arrest in Cameroon was also submitted. Chief Taku dates Bassanguen's third arrest in Cameroon as occurring on November 6, 2005. This was contrary to Bassanguen's testimony that the arrest occurred on November 6, 2004, and the fact that Bassanguen was in the United States in November 2005. When the IJ questioned Bassanguen as to why he abandoned his plan to present Chief Taku as a witness, Bassanguen explained that he removed Chief Taku as a witness because he realized that Chief Taku "doesn't hold the same position as he used to" with the SDF. J.A. 377. However, Bassanguen's advance notice to the court advised that Chief Taku would not be called as a witness for "personal reasons," and would not have affected the substance of his testimony regarding the arrest. J.A. 275. Bassanguen's explanation at the hearing also contradicted Kuissu's testimony regarding Chief Taku's continued leadership role in the SDF organization in the United States.

Bassanguen's testimony about his continued participation in the SDF party in the United States and his attendance at SDF meetings was also inconsistent with the testimony of Kuissu. Kuissu testified that he did not believe that Bassanguen was

7

still a member of the SDF. He testified that he last saw Bassanguen at an SDF meeting in 2008, and that he was present at but did not see Bassanguen at the November 2009 meeting.

Finally, the IJ found that Bassanguen's voluntary return to Cameroon from Nigeria after his second arrest undermined the credibility of his claim that he is afraid to return. The IJ additionally found that Bassanguen's explanation for his return did not adequately address these credibility concerns.

Having considered the entirety of the evidence presented, including the discrepancies found therein, the IJ rendered her adverse credibility determination, as follows:

> So considering the totality of the circumstances, the Court finds that the respondent was not sufficiently credible in his testimony. His fact witness [Kuissu] was not sufficiently credible. The overseas documents were not sufficiently probative and credible. The document generated by Chief Taku, because of a material inconsistency, is not probative. The respondent has failed to meet his legal burden to demonstrate that he was the victim of past persecution in Cameroon. I have considered whether or not, based on his activities in the United States, he has a well-founded fear of future persecution. Because of conflicting information regarding the status of his activities in the United States and given what the Court perceives, in any event, to be his low level of participation in the SDF at this point, the Court does not find that the respondent has met his legal burden to show that he has an objectively reasonable fear and in any event, the Court still does not credit the respondent's contention, at this point in time, that he has a fear that is subjectively genuine given the fact that he has on another occasion, after he claim[s] having been arrested and detained, returned voluntarily to Cameroon.

8

J.A. 279.  Consequently, the IJ denied Bassanguen's asylum claim and his request for withholding of removal.  Citing the same inconsistencies as well as several additional ones, the IJ also denied Bassanguen's request for relief under the CAT.

On appeal, the Board held that the IJ's adverse credibility determination was not clearly erroneous, concluded that Bassanguen did not submit adequate corroborating evidence to overcome the IJ's concerns with Bassanguen's credibility, and affirmed.

II.

A.

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum to an alien who qualifies as a "refugee."  See 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A).  A "refugee" includes "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . political opinion."  8 U.S.C. § 1101(a)(42)(A); see Zelaya v. Holder, 668 F.3d 159, 161 (4th Cir. 2012).  The applicant bears the burden of proving refugee status.  See Zelaya, 668 F.3d at 161.

9

The INA also provides for the withholding of removal.  See 8 U.S.C. § 1231(b)(3)(A); Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir. 2004).  The burden for prevailing on this claim is higher than under an asylum claim because the petitioner "must show a clear probability of persecution on account of a protected ground."  Djadjou v. Holder, 662 F.3d 265, 272 (4th Cir. 2011) (internal quotation marks omitted).  Because the burden of proof for withholding of removal is higher than for asylum, an applicant who is ineligible for asylum is necessarily ineligible for withholding of removal.  See id.

Finally, the CAT "prohibits the United States from returning any person to a country where the person has demonstrated that it is more likely than not that he will be tortured if returned to such country."  Zelaya, 668 F.3d at 161.

B.

The scope of our review of the BIA's decision "is narrow and deferential."  Djadjou, 662 F.3d at 273; see also Dankam v. Gonzales, 495 F.3d 113, 119 (4th Cir. 2007).  We will uphold the denial of an asylum claim "unless such denial is manifestly contrary to the law and an abuse of discretion."  Zelaya, 668 F.3d at 165 (internal quotation marks omitted).  "When the denial of asylum is based on the conclusion that the applicant failed to meet his evidentiary burden for establishing eligibility, then we review for substantial evidence and must

10

affirm a determination of statutory ineligibility by the BIA unless the evidence presented was so compelling that no reasonable factfinder could fail to find eligibility for asylum." Dankam, 495 F.3d at 119 (internal quotation marks omitted).

"Our review of an adverse credibility determination is [also] limited to ensuring that substantial evidence exists to support it." Djadjou, 662 F.3d at 273. "We accord broad deference to the agency's credibility determination," but the "deference . . . is not absolute." Id. "[T]he agency must provide specific, cogent reasons for making an adverse credibility determination." Id.

Under the provisions of the REAL ID Act of 2005, the testimony of an applicant alone can be sufficient to meet the applicant's burden of proof if the IJ is satisfied that the applicant's testimony is credible. See 8 U.S.C. § 1158(b)(1)(B)(ii). The IJ's credibility determination is governed by the following provision:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of

11

record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii).

Thus, as we have observed, "omissions, inconsistent statements, contradictory evidence, and inherently improbable testimony are appropriate bases for making an adverse credibility determination. The existence of only a few such inconsistencies, omissions, or contradictions can be sufficient for the agency to make an adverse credibility determination as to the applicant's entire testimony regarding persecution." Djadjou, 662 F.3d at 273-74 (citations omitted). The determination may not, however, be based on speculation, conjecture, or otherwise unsupported personal opinion. See id. at 274.

## III.

The IJ in this case grounded her adverse credibility determination on several inconsistencies within Bassanguen's testimony, as well as inconsistencies between Bassanguen's testimony and the corroborating evidence submitted in support of his claims.

On appeal, Bassanguen challenges the IJ's reliance upon three of these alleged inconsistencies: (1) Bassanguen's

12

acknowledgement that at least one of the letters purporting to be from his wife did not appear to contain her signature; (2) Bassanguen's voluntary departure and return to Cameroon in 2002, following two incidents in which he was allegedly arrested, detained, subjected to inhumane conditions, and persecuted; and (3) the discrepancy between Bassanguen's testimony and Chief Taku's letter regarding the alleged date of Bassanguen's third arrest in Cameroon.

We reject Bassanguen's first two challenges to the adverse credibility determination. The inconsistent signatures of Bassanguen's wife on letters submitted in support of his claims, and Bassanguen's acknowledgement that he submitted the letters even though at least one signature did not match that of his wife, was appropriately considered as a matter affecting his credibility. The IJ was also entitled to consider, as a part of the adverse credibility determination, Bassanguen's testimony that he voluntarily return to Cameroon in December 2002. This voluntary return would have occurred after two alleged prior incidents of persecution, the latter of which occurred a mere six months before the voluntary return and involved several days of inhumane treatment and beatings. See, e.g., Loho v. Mukasey, 531 F.3d 1016, 1018 (9th Cir. 2008); Ngarurih v. Ascroft, 371 F.3d 182, 189 (4th Cir. 2004). Although Bassanguen claims that he only decided to seek asylum after the third incident of

13

detention and inhumane treatment, the BIA correctly concluded that the "voluntary return after two arrests is a valid consideration, when considered along with the inconsistencies and other issues" in his evidentiary presentation.  J.A. 4.

The IJ's and the Board's reliance upon the discrepancy between Bassanguen's testimony and Chief Taku's letter regarding the date of Bassanguen's third arrest in Cameroon, however, is problematic.  The precise date varies only in the year of the arrest (November 6, 2004 versus November 6, 2005), and it is undisputed that Bassanguen was in the United States in November 2005.  Thus, at oral argument, the Attorney General rightly conceded that the date discrepancy alone was most likely a mere typographical or clerical error.

The IJ additionally observed that Bassanguen failed to offer a consistent explanation as to why he removed Chief Taku as a witness at the hearing, and that Chief Taku could have explained the discrepancy in the date had he testified. Nevertheless, the IJ and the Board both characterized the discrepancy in the date alone as a material one supporting the adverse credibility determination.  It also appears that the IJ may have relied upon the error to reject portions of the other corroborating evidence.  Because we cannot presume that the IJ would have weighed the other factors the same had it disregarded the perceived inconsistency between Chief Taku's letter and

14

Bassanguen's testimony, or that the Board would have reviewed the decision the same, remand is necessary to allow the IJ and the BIA to reassess Bassanguen's credibility under the totality of the circumstances, without regard to this single discrepancy.

IV.

For the foregoing reasons, we grant Bassanguen's petition for review in part, vacate the Board's order, and remand the matter for further consideration consistent with this opinion.

PETITION GRANTED IN PART;
VACATED AND REMANDED

DAVIS, Circuit Judge, concurring in the judgment:

Petitioner Thomas Deczem Bassanguen seeks review of an order of the Board of Immigration Appeals ("Board" or "BIA") dismissing his appeal of an Immigration Judge's ("IJ") decision. The IJ found Bassanguen removable and denied his applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The BIA affirmed the IJ's finding that Bassanguen was not "sufficiently credible in his testimony" to establish a right to relief.

I agree that the record compels us to grant the petition for review, although I would not attempt to cabin the remand for further review of Bassanguen's claims with the same parsimoniousness invoked by the majority. Indeed, it is unlikely that I would vote to grant the petition for review on the sole basis identified by the majority. Thus, as I set forth herein, I believe the record discloses several distinct but interrelated deficiencies in the IJ's adverse credibility determination, embraced by the Board, that together entitle Bassanguen to a remand. In short, as the case comes to us on the reasoning of the agency, the record does not rationally support the adverse credibility determination and the case requires a fresh look.

16

I.

A.

Bassanguen is a native and citizen of Cameroon. J.A. 765-66. He entered the United States on a nonimmigrant visitor visa in July 2005 with authorization to remain in the United States for a temporary period not to exceed September 4, 2005. J.A. 766, 856. Approximately one year later, he filed an affirmative application seeking asylum, withholding of removal, and protection under CAT based on past persecution (i.e., events surrounding his arrest and detention on three separate occasions) he experienced in Cameroon on account of his political activities and his fear of persecution in the future should he return to Cameroon. J.A. 753. The U.S. Department of Homeland Security ("DHS") placed Bassanguen in removal proceedings by filing a Notice to Appear with the Immigration Court, alleging he exceeded the period of stay authorized by his visa and charging him as removable pursuant to Immigration and Nationality Act ("INA") § 237(a)(1)(B). J.A. 856.

At his merits hearing before the IJ, Bassanguen testified on his own behalf and presented testimony from Dr. Mary Cogar, a clinical psychologist, and Enid Duplex Kuissu, a Social

17

Democratic Front ("SDF")[1] member and activist from Cameroon. In addition, he presented several documentary exhibits.

Bassanguen testified to incidents surrounding his three arrests after he became a member of the SDF in 1997. J.A. 339. He recalled that his first arrest in connection with his political activities occurred on May 24, 1997, when he was on his way to a protest organized by the SDF. J.A. 338-39. He was taken to the police precinct in the city of Yaounde and held for three days. J.A. 342-43. During his detention, he was "undressed all the way to [his] underwear," shoved into a cell with other protesters, and "morally tortured." J.A. 343. He testified that he did not suffer any other mistreatment, but that three days after his release he was "experiencing . . . nausea" and vomiting he believed was caused by the odor of urine in the cell. J.A. 344. He also experienced body aches from continuously lying on the cement floor. J.A. 344-45. He gained his release with the assistance of SDF attorneys. J.A. 346.

Bassanguen testified that his second arrest occurred five years later on June 30, 2002, when he was working as a polling officer representing the SDF. He observed what he believed to be

---

[1] "The SDF is a leading opposition political party in Cameroon, formed in 1990 to challenge the one-party dictatorship of the ultra-conservative Cameroon People's Democratic Movement (CPDM) that has ruled Cameroon since the country's independence." Petitioner's Br. 4.

boxes containing fraudulent ballots brought in for counting. J.A. 347-50. After he opposed pressure from representatives of the ruling party to count the ballots, the police arrived, arrested him, and detained him for five days. J.A. 349-51. He was undressed, pushed into a cell, and accused of "insult[ing] the people at the polling place and . . . ma[king] troubles at the polling place." J.A. 351. He was questioned and "beat[en] . . . badly with a round baton" on the bottom of his feet. J.A. 351-52. He recalled being beaten a total of three times; among other trauma, he was kicked by officers wearing "big policeman boots." J.A. 352-53. SDF attorneys intervened, and his release was conditioned on his no longer taking part in SDF marches and protests. J.A. 354. Upon release, Bassanguen experienced pain on the bottom of his feet, difficulty walking, and body aches. J.A. 354. He was prescribed medication from a family doctor. J.A. 354.

Bassanguen testified that his third arrest occurred two years later on November 6, 2004. J.A. 354-55. On that day, Bassanguen, along with other SDF members and members of other opposition parties, paraded to protest President Paul Biya's 22 years in power. J.A. 354-55. The police broke up the protest and arrested many protestors, including Bassanguen. J.A. 357. The police took him to the precinct in Yaounde, where he spent eight days. J.A. 357-58. Upon arrival, he and other arrestees were

19

stripped and beaten as they entered their cells. J.A. 358. On the second day, he was ordered to carry buckets of urine out of the cells, and upon returning, was beaten with a baton. J.A. 358-59. On the third day, police beat him with batons and "their big ranger's shoes" "to the point where [he] start[ed] limping on . . . [his] right leg." J.A. 360. He came out of the cell on what he believed was the fourth or fifth day, and was taken to the investigator's office. J.A. 361. He was then beaten on his back when he returned to his cell. J.A. 361. After the fifth day, he spent two days "lying down because [he] was hurting." J.A. 360-61. He escaped with the help of a policeman and went straight into hiding at his uncle's house on the outskirts of Yaounde, where he remained for more than seven months. J.A. 362-68. He recalled that he was "afraid" to go to his house because he would be arrested. J.A. 367. During this time, he testified, the police went to his house looking for him and questioned his wife, who was handcuffed. J.A. 369-70.

He testified that he was later accompanied by an officer of the gendarmerie to the U.S. Embassy in Cameroon to obtain a visitor visa to come to the United States, using a letter of invitation from a friend. J.A. 371-72. He entered the United States on July 5, 2005. J.A. 768.

Bassanguen stated that the only organization he belongs to in the United States is the SDF and that he participates in SDF

20

meetings and protests. J.A. 373-77. He could not testify to the number of first-Thursday-of-the-month SDF meetings he had attended (he stated it was more than five), but recalled that the first meeting he participated in was in August 2005 and the last was in November 2009. J.A. 381-82. He testified that if he returned to Cameroon, he believed he would be immediately arrested based on his political activities in the United States, which are "recorded, taped and sent back . . . home." J.A. 379.

On cross-examination he testified that he traveled from Cameroon to Nigeria and back to Cameroon in December 2002, several months after his second arrest. J.A. 394-95. He testified that he returned to Cameroon "because [he] didn't have trouble at that time," and "[officials] weren't looking for [him]," so he did not have any fear of returning. J.A. 394-95.

Dr. Cogar identified and swore to her psychological evaluation of Bassanguen. J.A. 328. She indicated in detail why she believed Bassanguen suffered from Post Traumatic Stress Disorder. J.A. 527, 332. Kuissu testified that he was a member of SDF in Cameroon and that he met Bassanguen in Yaounde, the capital city. J.A. 435. He said they participated together in marches organized by the SDF in Cameroon, and he confirmed that Bassanguen had been arrested at the November 6, 2004, protest. J.A. 436-37. Kuissu further testified, however, that he "really [didn't] know" and "didn't believe" that Bassanguen was still a

21

member of the SDF. J.A. 441. He testified that he did not see Bassanguen at the last SDF meeting he attended in November 2009, and that he last saw Bassanguen at an SDF meeting in 2008. J.A. 439, 441, 446.

*   *   *   *   *

Of course, it goes without saying that it is not for this court to decide how much, if any, of the above-described sordid tale of repeated mistreatment is accurate or true. That task falls to the IJ in the first instance, followed by plenary review by the BIA. Our more circumscribed role is to ensure that the agency acts in accordance with law and that the agency decision-making is a rational process. See ante at 8-11 (discussing our standards of review).

B.

The IJ issued an oral decision denying Bassanguen's applications for asylum, withholding of removal, and protection under CAT and ordered Bassanguen removed to Cameroon. J.A. 252, 254. Without reaching the substantive merits of Bassanguen's claims, the IJ found that Bassanguen's credibility was fatally undermined upon consideration of the following evidence and circumstances:

- Bassanguen's "voluntary return" to Cameroon from Nigeria after his first two arrests. J.A. 274. His explanation as to why he would be fearful now if he had to return did not "adequately address" the credibility concern. J.A. 274.

22

- It was "fundamentally dishonest" for Bassanguen to submit letters purportedly from his wife when he knew the signature on at least one of them did not appear to be that of his wife. J.A. 274-75. He later testified that he had spoken to his wife and she told him "she was afraid of the consequences of signing a letter in support of his asylum claim." The credibility of this explanation was undermined because it was "belatedly offered." J.A. 275.

- The "unexplained inconsistency" between a letter from Chief Taku and Bassanguen's testimony regarding the year of his third arrest (i.e., 2004 or 2005). J.A. 275. Bassanguen's explanation for why he did not call Taku as a witness was "implausible." J.A. 275.

- The inconsistencies between Kuissu's account of Bassanguen's participation in the SDF in the United States and Bassanguen's own account of the same. Based on these discrepancies, the IJ discredited Kuissu's account of Bassanguen's participation in SDF activities in Cameroon, including his account of the third arrest. J.A. 276.

- The IJ "d[id] not have confidence in" Bassanguen's documents in light of DHS's "unrebutted evidence which reflects random fraud of certain documents coming out of Cameroon." J.A. 277.

- Bassanguen conceded that his SDF card had mistaken information. J.A. 277.

- Discrepancies in the documents from Bassanguen's wife and his implausible explanation for them. J.A. 277-78.

- The SDF's letters were not "worthy of probative value"; a second letter indicated that a first letter contained inaccurate information but failed to explain how a letter with inaccurate information would have been generated. J.A. 278 (apparently referring to J.A. 544, 640).

- Dr. Cogar was a credible witness, but she made no credibility finding as to the facts. J.A. 278-79.

- The document Taku generated was not "probative" because of the "material inconsistency." J.A. 279

Thus, the IJ found that, considering the totality of the circumstances, Bassanguen "was not sufficiently credible in his testimony." J.A. 274, 279. The overarching credibility determination thus made, the IJ concluded that Bassanguen failed to demonstrate he was the victim of past persecution in Cameroon. J.A. 279. The IJ also concluded that Bassanguen failed to demonstrate a well-founded fear of future persecution, or to prove an objectively reasonable fear thereof because of "conflicting information" regarding the status of his activities in the United States and given, in the IJ's view, his "low level of participation in the SDF at this point." J.A. 279. Furthermore, the IJ found inadequate proof that Bassanguen's fear was subjectively genuine given his voluntary return. J.A. 279. The IJ thus denied all of Bassanguen's claims.

C.

Bassanguen filed a timely Notice of Appeal with the BIA. J.A. 242. The BIA determined that the IJ's adverse credibility determination was not clearly erroneous. J.A. 3. The BIA affirmed the IJ's reliance on the submission of documents Bassanguen testified were not signed by his wife, noting that the decision not to accept his explanation was based on a plausible view of the record; on the discrepancy between his testimony and Taku's letter regarding the year of the third arrest; on the inconsistency between testimony from Bassanguen

24

and Kuissu, noting that the IJ was not required to accept his explanation for the inconsistency; and on the basis of the adverse inference drawn by the IJ in respect to Bassanguen's return to Cameroon after his December 2002 trip to Nigeria. J.A. 3-4. The BIA also noted Bassanguen's inability to explain why two letters written by the same SDF official were on different letterhead. J.A. 4. The BIA explained that the corroborating evidence was insufficient to "overcome" the IJ's adverse credibility finding, noting problems with Taku's letter, Bassanguen's wife, and Kuissu. J.A. 4. The BIA dismissed the appeal. Bassanguen timely petitioned this court for review.

## II.

Where the BIA affirms the decision of an IJ (collectively, the "agency") in a written opinion, we review both decisions on appeal. Niang v. Gonzales, 492 F.3d 505, 511 n.8 (4th Cir. 2007); Kourouma v. Holder, 588 F.3d 234, 239-40 (4th Cir. 2009). We recently explained:

> We are obliged to uphold the BIA's determinations unless they are "manifestly contrary to the law and an abuse of discretion." Lizama v. Holder, 629 F.3d 440, 444 (4th Cir. 2011) (quoting Mirisawo v. Holder, 599 F.3d 391, 396 (4th Cir. 2010)) (internal quotation marks omitted). The agency abuses its discretion "if it fail[s] to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." Tassi v. Holder, 660 F.3d 710, 719 (4th Cir. 2011).

25

Our standard of review of the agency's findings is narrow and deferential. Dankam v. Gonzales, 495 F.3d 113, 119 (4th Cir. 2007). We seek to ensure that the agency's factual findings are supported by substantial evidence. Marynenka v. Holder, 592 F.3d, 594, 600 (4th Cir. 2010). Substantial evidence exists to support a finding "unless the evidence . . . was such that any reasonable adjudicator would have been compelled to conclude to the contrary." Id. (quoting Haoua v. Gonzales, 472 F.3d 227, 231 (4th Cir. 2007)) (internal quotation marks omitted). Similarly, we cannot reverse the agency's overall decision that an applicant is ineligible for asylum unless we determine that the applicant's evidence "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). Our review of legal issues, however, is de novo. Marynenka, 592 F.3d at 600.

Djadjou v. Holder, 662 F.3d 265, 273 (4th Cir. 2011).

III.

Bassanguen essentially makes two arguments. First, he contends that the BIA erred as a matter of law in concluding that he lacks credibility. More particularly, he argues that: (1) the BIA erred in sustaining certain erroneous conclusions reached by the IJ; and (2) the BIA and IJ failed to offer specific, cogent reasons for their adverse credibility findings.[2]

---

[2] To the extent that Bassanguen contends that the agency failed to consider the totality of the circumstances, the contention lacks merit. The REAL ID Act requires that the IJ "consider[] the totality of the circumstances, and all relevant factors" but allows an IJ to base the credibility determination on a host of factors, one of which is the consistency of an applicant's statements with "other evidence of record." This (Continued)

26

Second, he contends that the BIA and IJ, "[i]n contravention of controlling precedent," "completely disregarded the abundance of independent corroborating evidence" that "provides 'strong circumstantial evidence' that [Bassanguen] was imprisoned for his political expression of opposition to the Cameroonian government." Petitioner's Br. 15, 39 (citing Camara v. Ashcroft, 378 F.3d 361, 370 (4th Cir. 2004); see also Petitioner's Br. 28 ("The Board must not disregard independent corroborating evidence that establishes entitlement to relief merely on the

---

court has said, in pre-REAL ID Act cases, that an IJ need not provide "extensive reasoning" why each piece of the testimony or documentary evidence was rejected, see Kourouma, 588 F.3d at 241; Ganziami–Mickhou v. Gonzales, 445 F.3d 351, 358 (4th Cir. 2006) (upholding IJ's decision where IJ considered all documentary evidence and based decision on totality of the circumstances even though not discussing each document's individual worth). A balance must be struck between guarding against an IJ's use of the boilerplate "totality" language to protect empty analysis on the one hand, and according their findings the deference they statutorily deserve on the other hand. See Shrestha v. Holder, 590 F.3d 1034, 1042 (9th Cir. 2010) ("[A]n IJ normally may not rely on nothing more than a vague reference to the 'totality of the circumstances' or recitation of naked conclusions that a petitioner's testimony was inconsistent or implausible, that the petitioner was unresponsive, or that the petitioner's demeanor undermined the petitioner's credibility. We have consistently required that the IJ state explicitly the factors supporting his or her adverse credibility determination.").

The sometimes fine line between "boilerplate" and "naked conclusions" on the one hand, and a rational consideration of the totality of the circumstances, on the other hand, has not been crossed here.

27

basis of other immaterial discrepancies in an applicant's supporting evidence.").

I agree with the core assertions of Bassanguen's first contention. That is, as the Attorney General essentially conceded at oral argument, two of the factors the agency relied upon in reaching and sustaining the adverse credibility determination--Bassanguen's voluntary return to Cameroon after his ten-day visit to Nigeria in December 2002 and the presence of a typo in the documentation of the year (200<u>5</u> for 200<u>4</u>) of Bassanguen's third arrest--are so lacking in "cogency" as to undermine the agency's adverse credibility determination. To be sure, despite the fact that the BIA and the IJ relied on other (less weighty) factors to support the adverse credibility finding, there is ample room to say (on this record) the credibility finding is not supported by substantial evidence without those two pillars. Accordingly, further consideration, of both credibility and, if appropriate, on the merits, is appropriate.

A.

Bassanguen argues that the BIA erred in determining that his voluntary return to Cameroon constitutes a specific, cogent reason to support the adverse credibility finding because it was based on speculation and conjecture and is not supported by substantial evidence. Despite his "sufficient explanation as to

28

why he returned to Cameroon after traveling to Nigeria in 2002 but was fearful for his life when he left the country for the U.S. in 2005," (i.e., "[h]e was arrested for a third time two years after his return from Nigeria and was beaten almost every day") the IJ "speculated that his return to Cameroon after a ten-day trip in Nigeria is not plausible and thus undermined his credibility in his claim for asylum." Petitioner's Br. 24.

In my judgment, this factor is not supported by substantial evidence.[3] The IJ's conclusion completely disregards (without providing a specific, cogent reason for doing so) Bassanguen's third arrest in November 2004, which (based on his testimony) involved the longest period of detention, and I think is fairly characterized as the worst in terms of its physical brutality and psychological trauma. Manifestly, it is not remotely implausible for Bassanguen (or any reasonable person) to be seized by a heightened fear of persecution upon return where he

---

[3] To be sure, Bassanguen's argument that "circuit courts have determined that return trips to one's native country do not as a matter of law rebut the presumption of future persecution," Petitioner's Br. 28, is misplaced for the reasons given by the Attorney General. See Attorney General's Br. 20 n.5. First, there is no presumption of persecution here because the agency found that the claim of past persecution was not credible. See Djadjou, 662 F.3d at 272. Second, neither the IJ nor the BIA concluded that the voluntary return to Cameroon rebutted a presumption that Bassanguen would be persecuted in the future; instead they noted that his voluntary return undermined his credibility.

was arrested and beaten after engaging in political activities upon his prior return to Cameroon from Nigeria in 2002. Cf. Ngarurih v. Ashcroft, 371 F.3d 182, 189-90 (4th Cir. 2004) (voluntary return undermined claim of well-founded fear of persecution where "there [was] no evidence that [applicant] suffered any mistreatment" when he returned to country). There is a difference between (1) fearing return to a country after having departed and returned without experiencing torture or arrest and, (2) as here, fearing return to a country having departed and returned to experience renewed detention and further torture. The agency failed to recognize this distinction, only speculating that the return undermined Bassanguen's credibility.[4]

Furthermore, the IJ found in a wholly conclusory manner that Bassanguen's explanation as to why he would be fearful now to return was insufficient, and that he did not "adequately address" the credibility concern. She failed to provide a specific, cogent reason for why his explanation was not adequate, particularly in light of the third arrest. Compare

_____

[4] The facts and circumstances in Loho v. Mukasey, 531 F.3d 1016 (9th Cir. 2008), on which the Attorney General relies, are insufficiently described to discern whether the petitioner there experienced persecution before and after her voluntary returns. See id. at 1017-18. In any event, the IJ here did not adequately explain why Bassanguen's third arrest simply did not matter.

30

Djadjou, 662 F.3d at 274 (upholding IJ's rejection of petitioner's explanation where IJ provided reason for doing so), and Dankam v. Gonzales, 495 F.3d 113, 117-18 (4th Cir. 2007) (upholding IJ's rejection of plausible explanation where there was a discrepancy between dates in letters, and the second letter, allegedly meant to correct the first, did not acknowledge error or indicate purpose), with Tewabe v. Gonzales, 446 F.3d 533, 539 (4th Cir. 2006) ("The IJ here attached the bare label 'implausible' to Tewabe's testimony without providing specific and cogent reasons for doing so. This unexplained characterization is unsustainable because Tewabe's testimony is not inherently implausible."). Given the progression of the infliction of harms shown here, Bassanguen could have plausibly believed it was safe to return after two arrests, because "they weren't looking for [him]" then. J.A. 395. After the more recent and more brutal detention immediately preceding his departure for the United States in 2005, he (and any reasonable person) could well imagine that he was at a serious risk of harm upon his return after the third arrest and detention.

B.

In addition to the above consideration, I certainly join the majority's adoption of Bassanguen's argument that the BIA erred in concluding that an "immaterial discrepancy" between Bassanguen's testimony and Taku's letter, namely, the year of

31

the third arrest and detention, constituted a specific, cogent reason to support the adverse credibility finding. Bassanguen argues this is an "obvious" mistake or "clerical error" and that he "should have been afforded a reasonable opportunity to explain the inconsistency through questioning at his asylum hearing." Petitioner's Br. 31-32 ("Courts have held that an asylum applicant must be afforded an opportunity to explain any purported inconsistencies between their testimony and evidence." (citing Kin v. Holder, 595 F.3d 1050, 1057 (9th Cir. 2010); Zi Lin Chen v. Ashcroft, 362 F.3d 611, 618 (9th Cir. 2004), for the proposition that IJ's doubt in "veracity" of alien's story cannot serve as basis for adverse credibility finding where alien was not questioned further because it left court to speculate on the matter; Ordonez v. INS, 345 F.3d 777, 786 (9th Cir. 2003), for the proposition that "[t]he BIA violates an alien's due process rights when it makes a sua sponte adverse credibility determination without giving the alien an opportunity to explain alleged inconsistencies.")).[5]

---

[5] The Attorney General contends that Bassanguen has waived the argument that an IJ must notify a petitioner before holding an inconsistency against him because it was not raised in his Notice of Appeal or brief to the BIA. Attorney General's Br. 22 n.6 (citing 8 U.S.C. § 1252(d)(1), "A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available," and Kporlor v. Holder, 597 F.3d 222, 226 (4th Cir. 2010), "It is well established that an alien must raise each argument to the BIA before we have (Continued)

As the majority notes, at oral argument, the Attorney General expressly conceded that "more likely than not" the apparent "discrepancy" in the dates was a mere typo and that as a matter of common sense and logic, an innocent "typo" can have no genuine or probative bearing on credibility. Clearly, the Attorney General's concession is entirely warranted, as Taku expressly purports to know of an arrest in both November 2005 and November 2004. Compare J.A. 722 ("[Bassanguen] was arbitrarily arrested and detained three (3) times, (May 1997, June 2002 and November 2005)."), with J.A. 722 ("Other pro-democracy activist, including Thomas Bassanguen were arbitrarily arrested during a peaceful protest demonstration on November 6th, 2004."). The IJ failed to acknowledge this, or to acknowledge that it is undisputed that Bassanguen arrived in this country on July 5, 2005, and did not depart thereafter.[6]

---

jurisdiction to consider it." (internal quotation and citation omitted)). The Notice of Appeal broadly contested the agency's credibility finding, see J.A. 245 ("The IJ erred in ruling that Respondent was not credible based on some minor inconsistencies."), however, and this panel correctly concludes that the issue has been preserved.

[6] Moreover, the IJ's reliance on this "inconsistency" as "unexplained" is problematic in the extreme. The IJ failed to question Bassanguen about the matter, never specifically asked why Taku was not called to clarify the "inconsistency," and failed to provide a specific, cogent reason for how the failure to call him as a witness undermined Bassanguen's credibility. But, in the oral decision, the IJ suggests that Bassanguen was
(Continued)

C.

Unlike the majority, I am persuaded that, in light of the insubstantial nature of the above two pillars of the adverse credibility determination reached by the agency, the Board's treatment of two other aspects of the record supports our determination that a remand is appropriate.

First, as all agree, the Board's misapprehension of the typo in Taku's letter led it to the untenable conclusion that the letter was not "probative" because of the "material inconsistency." J.A. 279, 4. As explained, however, the "inconsistency" is a mere clerical error that is not remotely discrediting, of either the contents of the entire letter or of Bassanguen's own testimony.

Second, the record contains disturbing indications that the Board erroneously discredited the whole of Kuissu's testimony with no justification for doing so. In Zuh v. Mukasey, 547 F.3d 504 (4th Cir. 2008), we remanded for the IJ to consider the totality of the relevant evidence to determine whether petitioner merited discretionary asylum relief where, inter alia, the IJ abused her discretion by resting an adverse

---

asked, when he was not, why Taku was not called to clarify the "material discrepancy." To rely on a failure to explain an alleged "discrepancy" that all agree required no real explanation at all amounts to mere conjecture.

34

credibility finding on her disbelief of certain evidence but granted withholding of removal and CAT protection by relying on the same. 547 F.3d at 513. This was error because "[a]n IJ cannot have it both ways, finding an applicant and his documents incredible for one purpose and yet relying on them for another." Id.; see also Tassi, 660 F.3d at 724, n.11 ("The incongruity here, of course, is that even though the IJ determined that Tassi lacked credibility, the IJ relied on Tassi's credibility to find the September 2005 newspaper article to be incredible."). This rationale arguably applies here, where the IJ used the inconsistencies between Kuissu's account of Bassanguen's SDF participation in the United States and Bassanguen's own account of the same to find that Bassanguen was not credible, J.A. 276, but then found that the discrepancies also made Kuissu's account of Bassanguen's SDF participation in Cameroon, including his third arrest, not credible. In other words, the IJ relied on Kuissu's credibility, specifically with respect to Bassanguen's SDF participation in the United States, to discount Bassanguen's credibility, and then found that Kuissu was not credible with respect to his testimony regarding the third arrest, without providing any other specific, cogent reasons. J.A. 279.

Given this state of the record, while the IJ's adverse credibility finding rested on factors in addition to those that

35

are plainly out-of-bounds, those non-probative factors also infected the IJ's determination as to the weight of the overall evidence, including the corroborative evidence offered by Bassanguen. Accordingly, I am unable to conclude on this record that those remaining factors justify denial of the petition for review.

## IV.

For the reasons set forth, although I regret the majority's election to grant the petition for review on such a stinting basis, I am hopeful, if not confident, that the agency will give a fresh look at Bassanguen's application.